UNITED STATES of America, Appellee,

v.

Dave WITT, Abraham Inkeles and Murray Talanker, Appellants.

No. 23073.

United States Court of Appeals
Second Circuit.

Argued June 9, 1954.

Decided Sept. 7, 1954.

J. Edward Lumbard, U. S. Atty. for the Southern Dist. of New York, New York City (Howard A. Heffron, Brooklyn, N. Y., Leonard S. Sand, New York City, of counsel), for appellee.

Murray E. Gottesman, New York City (Albert A. Blinder and John M. Foley, New York City, of counsel), for appellants Witt and Inkeles.

Benenson & Israelson, New York City (Aaron Benenson, New York City, of counsel), for Talanker.

Before CHASE, Chief Judge, and FRANK and HINCKS, Circuit Judges.

FRANK, Circuit Judge.

The indictment, under which appellants were tried, charged that O'Brien, Talanker, Witt, Inkeles and Rourke, former Internal Revenue Agents, named as defendants, and Zelnick and Miller, named as co-conspirators but not as defendants, conspired together, in violation of 18 U.S.C. § 371 and 26 U.S.C. § 4047 (e)(4), from about December 23, 1946 until August 31, 1952, "to defraud the United States" and also "to defraud the United States in its governmental function of administering the revenue laws of the United States" free from corruption and its right to the honest and faithful services of the named revenue agents. The indictment alleged in effect that the conspiracy consisted of illegally demanding sums from taxpayers to each of whom it was represented that serious discrepancies existed between his books and his reported income, and that if he paid the demanded sum, a favorable report of his tax examination would be made.

There was evidence from which the jury could reasonably find the following: The conspiracy originated during July of 1946 when Miller, an accountant practicing in Catskill, New York, received a letter from Talanker, then an Internal

Revenue Agent, stating that the income-tax returns of Spector Bros. (one of Miller's clients) were under examination. Talanker, on a visit to Miller, informed him that Spector had failed to include some $60,000 of income in its returns. Together, Miller and Talanker went to see Spector who, after discussing the deficiency, agreed to pay $3,000 for a favorable tax report. Several weeks later, Spector, refusing to pay any more than $1,500 as a bribe, gave that sum to Miller in Talanker's presence. As was agreed, Talanker put through a favorable report on the Spector case.

Sometime during 1947 Miller contacted the officers of the H. & H. Transportation Lines, and showed them his notes indicating that the company's tax would be well over $10,000. He then stated that the whole thing could be cleared up for $5,000 cash. A few days later, Holmes, president of H. & H. Transportation Lines, drove with Miller to 73 Winthrop Street in Albany, New York, where he paid $5,000 to an agent whom he could not positively identify at the trial. Talanker admitted that he lived at 73 Winthrop Street. Miller positively identified Talanker as the man to whom Holmes gave the money.

Talanker left the Internal Revenue Department on June 30, 1947. In August 1947, O'Brien, who died after sentence, became Chief of the Internal Revenue Department's office at Troy, New York.

Sometime during the latter part of 1948, Miller learned that Acme Glove Corporation, another of his clients, was about to undergo an examination of its corporate tax returns by an agent named Nudelman whom Talanker characterized as a "tough agent." Miller contacted Talanker; Talanker promised to get in touch with O'Brien and have the case assigned to another agent. Talanker and Miller then called on Snyder, Vice-President of Acme Glove Corporation, who agreed to pay $3,000 for a favorable examination. On October 30, 1948, when Miller and Talanker appeared with Agent Rourke, Snyder gave $3,000 to Miller in Talanker's presence. According to Miller, Talanker, Rourke and O'Brien shared the $3,000 equally.

The tax returns of Oppenheimer, a Miller client, were assigned to Agent Zelnick for investigation in November of 1948. Miller cultivated Zelnick during the period November 1948 to March 1949, and finally, in March, persuaded Zelnick to "fix the case." Miller then conferred with Oppenheimer and suggested to him that he offer Zelnick a bribe. The price agreed on was $1,000. After speaking to O'Brien, Zelnick replaced pages 3 and 4 of the Oppenheimer return with new pages so that no additional tax was due.

The tax return of Orloff C. Barlow was "fixed" by Miller, Inkeles and O'Brien in June of 1949. During that month, Miller approached Talanker on the subject of the tax return of Ernest Bell, for the purpose of having Talanker arrange to have another agent substituted for the one then investigating Bell's tax returns. During this period, Talanker introduced Miller to O'Brien; O'Brien gave the file on Bell to Miller and instructed Miller to see Witt about it. Witt, under Talanker's direction, wrote out a report in Talanker's office. Miller, also under Talanker's direction, collected $1,000 from Bell. Talanker, Witt, Miller and O'Brien shared the $1,000 paid by Bell.

During the summer of 1949, the return of the New Hotel Walters, Inc. (a Miller client) was assigned to Zelnick for investigation. Miller, Zelnick and O'Brien shared the $2,000 paid by this taxpayer for a favorable examination. Inkeles received $1,000 for "preparing" the return of Dr. Brown; this sum was divided among Miller, Inkeles and O'Brien. Toward the end of 1949, Miller, Inkeles and O'Brien shared the $2,000 received for "fixing" Dr. McQuade's return.

Van Loan, a client of Miller's, informed Miller, sometime during 1949, that his (Van Loan's) returns were under investigation in the Boston Office. Talanker told Miller to have the case transferred to the Troy Office. Later, Talanker informed Miller that Witt had been assigned to the case. After examin-

ing the taxpayer's 1947 return, Talanker ordered Witt to write a favorable report. Miller was instructed by Talanker to obtain $1,000 from the taxpayer. Miller, Witt, Talanker and O'Brien shared this "fee." Zelnick handled Van Loan's 1948 tax return, and, with Miller's help, obtained $800 for this "fix."

The Levison return was examined by Witt in December of 1949. Miller, Witt and O'Brien shared the $1,000 paid by Levison. In that same month, Miller and Zelnick collected $750 from Dr. Page.

From June of 1950, when Talanker, Witt, Inkeles, Zelnick, O'Brien and their wives were all present at a party given by Miller, until January of 1951, five cases were "fixed." Zelnick and Miller obtained $3,500 for "fixing" the Osborn return. Witt and Miller were paid $1,000 for "fixing" the Reis return. Miller and Zelnick "fixed" the Krauss and Ingalls returns. During this period, the 1948 Van Loan return was "fixed."

In January of 1951, Miller and Zelnick approached De Stefano Bros., although the De Stefano returns were not under investigation by any government agency. They succeeded in getting $3,000 from De Stefano Bros.

Both Miller and Zelnick testified for the prosecution in the present case. Talanker, Witt, Inkeles and O'Brien were found guilty and sentenced. Rourke was acquitted. O'Brien died subsequent to sentencing. Talanker, Witt and Inkeles have appealed from the judgment of conviction.

■ 1. Talanker contends that the proof shows not one conspiracy but a number of separate conspiracies to some of which he was not a party, and that, accordingly, we must reverse, pursuant to Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557. We do not agree. There was evidence from which the jury could reasonably conclude that appellants, together with Miller, O'Brien and Zelnick, formed a single "ring," the aim of which, known to all the conspirators, was, for a "fee" in each instance to "fix" real or

purported government claims based on defective income-tax returns and thus to defraud the United States; and that the operations of this single over-all conspiracy had a continuing character. It is not inconsistent with that conclusion that any particular "fix" was conducted by particular conspirators, or was not known to all the conspirators, or that the "fee" exacted in each "fix" was retained by those of the conspirators who participated in that "fix." We think Blumenthal v. United States, 332 U.S. 539, 558, 68 S.Ct. 248, 92 L.Ed. 154 governs here. See United States v. Ganey, 2 Cir., 187 F.2d 541.

■ 2. Talanker alleges error in the reception of evidence of the Spector "fix," in which he and Miller participated, because it occurred in 1946, before December of that year, the earliest date named in the indictment as to the existence of the conspiracy. We think this evidence properly admissible to show the way the conspiracy came into being and its *modus operandi* when it operated. See United States v. Dennis, 2 Cir., 183 F.2d 201; Heike v. United States, 227 U.S. 131, 33 S.Ct. 226, 57 L.Ed. 450.

■ Witt and Inkeles assert that, as against them, it was error to admit that evidence and also evidence of the Holmes "fix," since both those transactions occurred without their knowledge and before the time when (according to the government) these defendants became conspirators. We think there was no error. This evidence tended to show the nature of the conspiracy in existence when these defendants joined it. United States v. Lekacos, 2 Cir., 151 F.2d 170, reversed on other grounds *sub nom.* Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557; Lefco v. United States, 3 Cir., 74 F.2d 66.

■ 3. We see no merit in Talanker's contention that, as to him, the judge erred in admitting the testimony of the bribing of Revenue Agent Zelnick, because the indictment did not specifically charge that Talanker conspired to corrupt Zelnick. Talanker, as

a member of the single, comprehensive conspiracy, was responsible for the acts of his co-conspirators which formed a part of their joint undertaking. United States v. Kissel, 218 U.S. 601, 31 S.Ct. 124, 54 L.Ed. 1168.

4. The indictment named, as violated statutes, 26 U.S.C. § 4047(e)(4) and 18 U.S.C. § 371 (formerly 18 U.S.C. § 88). Under 26 U.S.C. § 3748, the statute of limitations applicable to 26 U.S.C. § 4047 (e)(4) is six years; under 18 U.S.C. § 3282, the period applicable to 18 U.S.C. § 371 is three years. Talanker contends—and we assume *arguendo*—that 26 U.S.C. § 4047(e)(4) relates solely to crimes by revenue agents and does not extend to others even if the latter conspired with such agents. There is no proof of overt acts by the conspirators during that period of 1947 before Talanker ceased to be a revenue agent. Later, as an accountant in private practice, he actively participated in the conspiracy in 1949 but not later. On these facts, he contends that, when the indictment was filed, on April 14, 1953, the three-year statute of limitations, 18 U.S.C. § 3282, had run.

■ We do not agree. There is ample evidence that other members of the conspiracy committed overt acts as part of the conspiracy after April 14, 1950. Since Talanker failed to prove, and there is no evidence, that he ever affirmatively dissociated himself from the conspiracy, he must be deemed to have remained a party to it subsequent to April 14, 1950.[1] Accordingly, since he was liable as a private person under 18 U.S.C. § 371, the three-year statute had not run in his favor when the indictment was filed. As the indictment stated that he ceased to be a revenue agent in 1947, and cited 18 U.S.C. § 371, we think it sufficiently

charged him in his capacity as a private person.[2]

5. Witt and Inkeles complain that the prosecutor, in his opening statement to the jury, failed to state the character of the entire conspiracy, to read the indictment, and to refer to the names of government witnesses other than Miller and Zelnick. Not only in our opinion was this statement adequately informative,[3] but none of the appellants objected to it at the time.

■ 6. One of the jurors, during the trial, asked whether defendants who had not sought a bill of particulars might have done so and thereby obtained government evidence before the trial. We think the judge answered the question satisfactorily: he made it clear that no adverse inference should be drawn from the failure of defendants to seek such a bill.

■ 7. During the trial, some of the jurors, with the judge's consent, put questions to witnesses and received answers. We think that a matter within the judge's discretion, like witness-questioning by the judge himself, as to which see United States v. Rosenberg, 2 Cir., 195 F.2d 583, 593–594.

■ 8. One juror, during the trial, went to the library to see "if he could find out about the ethics of a lawyer in taking cases." The prosecutor informed the judge and defense counsel of this fact. The judge sent for the juror who told the judge in chambers that "he could not find what he was looking for," that he had formed no opinion concerning the case, that he "had not told any of his fellow jurors" about his investigation, that nothing he had found "would affect him," and that "he would take the law from the court." Nevertheless, the prosecutor moved that this juror be ex-

---

1. Hyde v. United States, 225 U.S. 347, 369, 32 S.Ct. 793, 56 L.Ed. 1114; Pinkerton v. United States, 328 U.S. 640, 646, 66 S.Ct. 1180, 90 L.Ed. 1489; United States v. Compagna, 2 Cir., 146 F.2d 524, 527; United States v. Cohen, 2 Cir., 145 F.2d 82, 90; United States v. Markman, 2 Cir., 193 F.2d 574, 576.

2. As noted below, neither he nor any of the other defendants sought a bill of particulars.

3. Again it is pertinent that, as noted below, none of the defendants sought a bill of particulars.

cused and an alternate juror substituted. After consulting the defendants, defense counsel stated that they did not join in the prosecutor's motion, which the judge denied. It is incomprehensible that defendants should now assert error in this respect.

9. Nor do we agree with the defendants that the judge erroneously "appealed" to the jury to convict them in that part of his charge quoted in the footnote,[4] which is substantially similar to the charge we approved in United States v. Hiss, 2 Cir., 185 F.2d 822.

Affirmed.

4. "Now, ladies and gentlemen, if you find that the evidence respecting the defendants, or a defendant, is as consistent with innocence as with guilt, such defendant or defendants should be acquitted. If you find that the law has not been violated, you should not hesitate for any reason to find a verdict of acquittal. But, on the other hand, if you find that the law has been violated as charged, you should not hesitate because of sympathy or any other reason to render a verdict of guilty, as a clear warning that a crime of this character may not be committed with impunity. The public is entitled to be assured of this."