**UNITED STATES of America**

v.

**Max L. SHULMAN, a/k/a "The Major", Defendant.**

**No. 78 Cr. 890–CLB.**

United States District Court, S. D. New York.

Feb. 23, 1979.

Federico E. Virella, Jr., Asst. U. S. Atty., Robert B. Fiske, Jr., U. S. Atty., Southern District of New York, New York City, for plaintiff.

Jules Ritholz, Gerald A. Feffer, Stuart E. Abrams, Kostelanetz & Ritholz, New York City, for defendant.

MEMORANDUM AND ORDER

BRIEANT, District Judge.

By pre-trial motion docketed February 13, 1979 and heard before me on February 16, 1979, defendant has moved for relief

pursuant to Rule 12(b)(1) and (2), F.R. Crim.P., dismissing all or alternatively part of the indictment on the separate grounds discussed below.

The indictment was filed December 18, 1978. It contains two counts. In the second count defendant is charged with the crime of bribery of a public official, in violation of 18 U.S.C. §§ 201(b) and 2. Under that count the Government offers to prove at trial that on or about December 11, 1978, defendant knowingly, wilfully and corruptly caused one Brooks, a professional appraiser of property and private citizen, to deliver and pay the sum of $10,000 in cash furnished by defendant to one Rocoff in this District. Rocoff was an Internal Revenue Agent who was assigned to the Valuation Group of the Internal Revenue Service, United States Treasury Department. It is claimed defendant did so with the intent to influence Rocoff in the performance of his official duties, specifically to induce him to place a low [or false] appraisal, for federal estate tax purposes, upon certain assets of the Celia Weinstein Estate. It was stated at the hearing that defendant is one of the executors of the Celia Weinstein Estate, which Estate was liable for federal estate taxes imposed under 26 U.S.C. §§ 2001, *et seq.* No objection is made to the form of pleading of Count 2. Defendant conceded at the hearing that Count 2 of the indictment is sufficient on its face to charge the crime referred to therein, which is a 15 year count.

The indictment also contains Count 1, based on the same facts noted above. By this count, the same defendant is charged with having conspired with the same Brooks, named as a co-conspirator in Count 1, but not as a defendant, and also with the same Internal Revenue Agent Rocoff, also not named as a defendant, but alleged to be a co-conspirator. The purpose of such conspiracy is said to have been to "defraud the United States," and it is alleged that the conspirators would and did defraud the Treasury by deceit, craft, trickery and dishonest means, in the due and proper administration and enforcement of the tax and revenue laws. It is pleaded that as a part of the conspiracy defendant offered approximately $10,000 to Rocoff through the agency of co-conspirator Brooks in return for which a low appraisal value would be placed on the taxable assets of the Celia Weinstein Estate. The means pleaded in Count 1 are that the defendant "agreed to pay a bribe of $10,000" through Brooks to an IRS official (Rocoff), who in turn had agreed to reduce the IRS appraised value of the Weinstein Estate from $10,000,000 to $6,000,000. It is not clear from the pleading whether those figures represent the gross, or the net taxable estate. However, the federal estate tax, before state credit, is imposed at 70% at $6,000,000 net taxable estate, increasing rapidly above that amount.

The overt acts pleaded in Count 1 consist of a conversation in Manhattan in September 1978 between Brooks and Rocoff, and a conversation in the Eastern District of New York between defendant and Brooks in which the defendant "agreed that Brooks should see what could be done about bribing and paying off an IRS official and employee to lower the value of the Celia Weinstein Estate." An agreement reached on or about December 7, 1978 is pleaded as overt act No. 3, although agreeing is not by itself an overt act. As the fourth overt act pleaded, it is alleged that on December 11, 1978 in the Eastern District of New York, defendant "counted and gave approximately $10,000 in cash" to co-conspirator Brooks, not a federal employee.

It was conceded at oral argument that there was no item of evidence which could be elicited by the Government at trial in support of Count 1, which was not also properly admissible and available to the Government at a trial on Count 2 only.

Count 1 is a five year count. It is pleaded based on 26 U.S.C. § 7214(a)(4).*

---

* The entire statute reads as follows:

"§ 7214. *Offenses by officers and employees of the United States*

(a) Unlawful acts of revenue officers or agents.—

## The Motion to Dismiss Count 1

[1] As the first item of relief requested in this motion, defendant seeks to dismiss Count 1, not for redundancy and uselessness, or prosecutorial overkill, all of which are present, but unfortunately not provided for in the Federal Rules of Criminal Procedure. Rather, he seeks to dismiss it for failure to charge an offense.

The argument in support of the motion is simple and appealing. The statute on its face, and by title, refers to and contemplates punishment of offenses by those officers and employees of the United States, specifically described therein, hereinafter for convenience referred to as "Revenue Agents" or merely "Agents." The statute contemplates that the Revenue Agent being punished thereunder, under subparagraph (a)(4) will have been one who "conspires or colludes with any other person to defraud the United States." It is obvious and was known to Congress when this statute was passed, that most persons who would be tempted or motivated to collude with Revenue Agents for such purpose would be private persons, that is, taxpayers and their representatives. The statute does not, by its express terms, reach such private persons.

> Any officer or employee of the United States acting in connection with any revenue law of the United States—
> (1) who is guilty of any extortion or willful oppression under color of law; or
> (2) who knowingly demands other or greater sums than are authorized by law, or receives any fee, compensation, or reward, except as by law prescribed, for the performance of any duty; or
> (3) who with intent to defeat the application of any provision of this title fails to perform any of the duties of his office or employment; or
> (4) who conspires or colludes with any other person to defraud the United States; or
> (5) who knowingly makes opportunity for any person to defraud the United States; or
> (6) who does or omits to do any act with intent to enable any other person to defraud the United States; or
> (7) who makes or signs any fraudulent entry in any book, or makes or signs any fraudulent certificate, return, or statement; or
> (8) who, having knowledge or information of the violation of any revenue law by any

It seems implicit in the statute that a person not employed as a Revenue Agent could be convicted as an aider and abettor under 18 U.S.C. § 2. There is no requirement for an aider and abettor to be within the group whose activities are controlled by a penal statute. For example, in a common law prosecution for rape, a woman could be convicted as an aider and abettor, notwithstanding that, at least at common law, a woman was incapable herself of committing the crime of rape. See *People v. Reilly*, 85 Misc.2d 702, 381 N.Y.S.2d 732 (Westchester County Court 1976) and cases therein cited.

There is authority that an aider and abettor who is not a Revenue Agent can be convicted of the substantive crime of violating any subdivision of § 7214(a). *United States v. Campbell*, 426 F.2d 547 (2d Cir. 1970) holds that a person not a Revenue Agent can violate § 7214(a) as an aider and abettor. See also, *United States v. Kenner*, 354 F.2d 780 (2d Cir. 1965).

In this case, however, the Government seeks to carry the point of *Campbell* one step further, by placing a gloss on the statute to make it a crime for persons not Revenue Agents to conspire with each other (Shulman and Brooks) to cause a Revenue Agent (Rocoff) to violate the statute by conspiring with them.

> person, or of fraud committed by any person against the United States under any revenue law, fails to report, in writing, such knowledge or information to the Secretary or his delegate; or
> (9) who demands, or accepts, or attempts to collect, directly or indirectly as payment or gift, or otherwise, any sum of money or other thing of value for the compromise, adjustment, or settlement of any charge or complaint for any violation or alleged violation of law, except as expressly authorized by law so to do;
> shall be dismissed from office or discharged from employment and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both. The court may in its discretion award out of the fine so imposed an amount, not in excess of one-half thereof, for the use of the informer, if any, who shall be ascertained by the judgment of the court. The court also shall render judgment against the said officer or employee for the amount of damages sustained in favor of the party injured, to be collected by execution."

There is no reported case of such a conviction, although this statute and its predecessors have existed for a century.

Bribery of those who farm the taxes has been known throughout recorded history. Such practices led to the French Revolution and contributed to the fall of Rome. The practices said to have occurred here are not unknown in this country. The existence of this century old penal statute is some evidence of that fact. For a feeling of *deja vu* see the comprehensive discussion by Circuit Judge Medina in *United States v. Nunan*, 236 F.2d 576 (2d Cir. 1956), *cert. denied* 353 U.S. 912, 77 S.Ct. 661, 1 L.Ed.2d 665, which describes in detail the activities of defendant Commissioner of Internal Revenue, and the resulting Congressional sub-committee established February 2, 1951 by H.R. 78 to "Investigate the Administration of the Internal Revenue Laws" known as the King Committee. Surely that extensive inquiry was not the first; nor will it be the last. Accordingly, and in view of the historical background, it is surprising that there has been no prior attempt to prosecute a private citizen on a conspiracy count under this section. This notwithstanding the extreme seriousness of such misconduct.

Dictum in *United States v. Grunewald*, 233 F.2d 556, 567 (2d Cir. 1956), *rev'd. on other grounds*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), is opposed to the Government's present contentions:

> "One of these statutes, 18 U.S.C. § 371 [the general conspiracy statute] applies to all persons; the other, 26 U.S.C. § 4047(e)(4) [renumbered now as § 7214], applies specifically to 'every officer or agent appointed and acting under the authority of any revenue law of the United States * * * '." [Matter in brackets added].

The penalty clause of § 7214 is by its terms impossible of application to persons other than Revenue Agents. This would suggest that Congressional intention was to punish under this law only the tax agent co-conspirator participating in the typical conspiracy to defraud the revenue, which usually includes both a taxpayer and a public. A reasonable private person not learned in the law, on reading § 7214 would not consider that it applies to him. The conduct complained of in this case is clearly punishable under §§ 201(b) and 2 of Title 18 of the United States Code. Is Congress to be presumed to have intended a redundancy?

In *United States v. Witt*, 215 F.2d 580 (2d Cir. 1954), by Circuit Judge Frank, former Revenue Agents were charged with having conspired together both in violation of 18 U.S.C. § 371 and the statutory predecessor of § 7214(a)(4), in resolving a statute of limitations issue, Judge Frank assumed, p. 584, for the purposes of argument, that the statute "relates solely to crimes by revenue agents and does not extend to others even if the latter conspired with such agents." While this is not a holding, we doubt that careful jurist would have engaged in such a broad assumption if it were unreasonable or unwarranted. Finding a conviction under 18 U.S.C. § 371 not barred by the shorter statute of limitations applicable to any person, under that section, the Court affirmed Witt's conviction.

If Congress had intended that private persons be prosecuted for conspiracy under § 7214(a)(4) it could have said so in that clear English by which a citizen is entitled to notice of what constitutes criminal conduct. There are a vast number of federal felonies, ranging in significance from murder on the high seas (18 U.S.C. § 1652) to the improper sale of white phosphorus matches (26 U.S.C. § 7239). Indeed, it is a federal misdemeanor for a district judge to approve payment of legal fees settled by agreement among the attorneys following a dispute in a bankruptcy case (18 U.S.C. § 155).

█ As a matter of policy, the Court should hold the Congress to a precise statement of what constitutes wrongdoing. As our Court of Appeals held in *United States v. Posnjak*, 457 F.2d 1110, 1118 (2d Cir. 1972):

> "And it is a well-established principle that criminal statutes are to be narrowly rather than expansively construed, in or-

der to avoid subjecting to prosecution any activities and individuals the legislature did not mean to expose to liability.[9] [Footnote 9. *United States v. Bass,* 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971). See 3 Sutherland, Statutory Construction (3d Ed. F. Horack 1943). Ch. 56, §§ 5604–06, at 44–67; *Yu Cong Eng v. Trinidad,* 271 U.S. 500, 515–523, 46 S.Ct. 619, 70 L.Ed. 1059 (1926). Judicial 'revision' or 'expansion' of criminal statutes may lead to problems of vagueness under the due process clause, for the statute on its face may not adequately warn individuals of what is proscribed. *See Johnson v. United States,* 410 F.2d 38 (8th Cir.), *cert. denied,* 396 U.S. 822, 90 S.Ct. 63, 24 L.Ed.2d 72 (1969). *See also Winters v. New York,* 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948); *United States v. L. Cohen Grocery Co.,* 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516 (1921).]"

To the same effect is *United States v. Berger,* 338 F.2d 485, 487 (2d Cir. 1964) and authorities therein cited. See also, *United States v. Laub,* 385 U.S 475, 487, 87 S.Ct. 574, 581, 17 L.Ed.2d 526 (1967), holding "[c]rimes are not to be created by inference. They may not be constructed *nunc pro tunc.*"

There is no public necessity for implying a crime under § 7214 in this case, because the criminal activity with which this defendant is charged is clearly violative of another federal statute carrying a higher penalty. Because his alleged activities were discovered, defendant did not succeed in reducing the taxes of the Celia Weinstein Estate. For this reason, and perhaps also because Rocoff had "turned" by then, defendant is probably not an aider and abettor of a violation by Rocoff of § 7214(a)(2), (3), (4), (5), (6), (7) or (9).

In 1925, Judge Learned Hand, writing for the Court of Appeals in *Harrison v. United States,* 7 F.2d 259, 263 (2d Cir.) held:

"It appears to us that the maximum sentence prescribed by Congress is intended to cover the whole substantive offense in its extremest degree, no matter in how many different ways a draughtsman may plead it, and even though he add a count for conspiracy, that darling of the modern prosecutor's nursery."

Probably with the increased skepticism of jurors during the intervening years, this perception of the indiscriminate use of conspiracy counts *in terrorem* is no longer realistic. Often it seems that the complicated and unduly prolonged jury instructions (Mumbo Jumbo to some) required in a conspiracy case serve to extend and complicate the trial beyond its necessities, with no definable benefit to either side. On the particular facts of this indictment, if defendant is not guilty on Count 2, then it is highly unlikely that a conviction on Count 1 could be obtained.

Count 1 is dismissed.

### Motion to Dismiss the Entire Indictment

■ Additionally, defendant moves to dismiss the entire indictment because of a claimed failure by the prosecutor to follow what is characterized as "grand jury guidelines" promulgated in writing by the Department of Justice on December 16, 1977 by a "Communication" affecting the provisions of the "United States Attorneys Manual," or "USAM," discussed below. Specifically, the claim is that such provisions were "violated" in that defendant was never given an opportunity to request that he appear before the grand jury to testify prior to the filing of the indictment. Defendant claims that failure by the federal agency (here the Department of Justice) to follow its published regulations constitutes a violation of due process. See, *e. g., United States v. Heffner,* 420 F.2d 809 (4th Cir. 1969); *United States v. Caceres,* 545 F.2d 1182 (9th Cir. 1976); and *United States v. Sourapas,* 515 F.2d 295 (9th Cir. 1975); which together are known as the *Heffner-Caceres-Sourapas* doctrine, not yet adopted in this Circuit.

In effect, defendant seeks to extend and apply the exclusionary rule to the fruits of an agency action otherwise lawful and valid, which does not accord with self imposed limitations on agency conduct.

Consideration of the purpose and effect of USAM is an appropriate place to commence the discussion. The Court has procured and examined the entire USAM which consists of eight large looseleaf binders with items separated by dividers, separately numbered in nine separate titles and subsections. This material is updated from time to time by the "United States Attorneys' Manual Staff Executive Office for U.S. Attorneys" located, naturally, in Washington, D.C.

The USAM does not have standing as a part of the Code of Federal Regulations, and none of its provisions have been published in the Federal Register. It does not appear that all of its provisions have enjoyed wide circulation. It seems clear that USAM lacks the force of law. The Court does not construe the Manual as altering or changing the well known standards for determining whether prosecutorial misconduct exists in a given case, or if so what remedy is available to the person adversely affected thereby. Rather, it represents an attempt by the Department to guide, indoctrinate and control the large number of persons in the districts who are vested with prosecutorial functions. Formerly this was done by word of mouth, tradition, and the constraints of judicial precedent.

That this is a proper construction of USAM appears from Title 1 thereof, § 1–1.-100. This section contains the following relevant provisions:

"1–1.100 PURPOSE OF THE MANUAL
This United States Attorneys' Manual is a text prepared to aid the United States Attorneys and their Assistants in the performance of their important public responsibilities. It is designed to be the single repository of all materials and general policies and procedures relevant to the work of the United States Attorneys' Offices and to their relations with the Department of Justice with the legal divisions, investigative agencies, other bureaus and divisions, and the Office of Management and Finance (see Administrative Directives System for purely administrative guidance). The contents of this Manual are, accordingly, a necessary and invaluable guide to the United States Attorneys, their Assistants, and attorneys of the legal divisions in carrying out their duties and exercising their discretion, under the direction of the Attorney General, in representing the United States.

*This Manual provides only internal Department of Justice guidance. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal. Nor are any limitations hereby placed on otherwise lawful litigative (sic) prerogatives of the Department of Justice."* (Emphasis added.)

Indeed, the face sheet to the December 16, 1977 "Communication" here relied on suggests that the release is issued "pursuant to and EXPIRES (emphasis in original) unless reissued or incorporated pursuant to USAM–1–1.550." USAM § 1–1.550 reads in relevant part that "to insure their [such releases] timely incorporation [in the Manual] all such communications will have a life span of 5 months, after which they will no longer be in effect unless incorporated into the text of the Manual or reissued." It was not made to appear on the motion whether the material relied on has in fact been reincorporated in the Manual. Since the Government did not dispute the effectiveness of the December 16, 1977 communication, we assume it is still in effect.

The introductory material to this December 16, 1977 release, affecting USAM §§ 9–11.000, *et seq.* contains the following statement: "The Attorney General has approved the following regarding grand jury practice. Please make sure that all Assistant United States Attorneys are aware of the changes in policy which effect improvements to eliminate the appearance of unfairness in some procedures." Included therein is a statement of policy that "generally targets should not be subpoenaed to a grand jury except where it is essential to the investigation." That immediately precedes the sections relied on by movant, which are quoted in full below:

"9–11.252 *Requests by Subjects and Targets to Testify before the Grand Jury*

It is not altogether uncommon for subjects or targets of the grand jury's investigation, particularly in white-collar cases, to request or demand the opportunity to tell the grand jury their side of the story. While the prosecutor has no legal obligation to permit such witnesses to testify (*United States v. Gardner,* 516 F.2d 334 (7th Cir. 1975), *cert. denied,* 423 U.S. 861 [96 S.Ct. 118, 46 L.Ed.2d 89] (1976)), a refusal to do so can create the appearance of unfairness. Accordingly, under normal circumstances, where no burden upon the grand jury or delay of its proceedings is involved, reasonable requests by a 'subject' or 'target' of an investigation (as defined in 9–11.250, *supra*) personally to testify before the grand jury ordinarily should be given favorable consideration, provided that such witness explicitly waives his privilege against self-incrimination and is represented by counsel or voluntarily and knowingly appears without counsel and consents to full examination under oath.

Some such witnesses undoubtedly will wish to supplement their testimony with the testimony of others. The decision whether to accommodate such requests, reject them after listening to the testimony of the target or the subject, or to seek statements from the suggested witnesses is a matter which is left to the sound discretion of the grand jury. When passing on such requests, it must be kept in mind that the grand jury was never intended to be and is not properly either an adversary proceeding or the arbiter of guilt or innocence. See, e. g., *United States v. Calandra,* 414 U.S. 338, 343 [94 S.Ct. 613, 38 L.Ed.2d 561] (1974)."

"9–11.253 *Notification of Targets*

Where a target is not called to testify pursuant to 9–11.251, *supra,* and does not request to testify on his own motion (see 9–11.252, *supra*), the prosecutor, in appropriate cases, is encouraged to notify such person a reasonable time before seeking an indictment in order to afford him an opportunity to testify (subject to the conditions set forth in 9–11.252, *supra*) before the grand jury. Of course, notification would not be appropriate in routine clear cases nor where such action might jeopardize the investigation or prosecution because of the likelihood of flight, destruction or fabrication of evidence, endangerment of other witnesses, undue delay or otherwise would be inconsistent with the ends of justice."

These sections are replete with qualifiers, modifiers, provisos, exceptions and limitations, intermixed with buzz-words. Even were it not for the express disclaimer quoted above from the Introduction of the USAM, it is hard to see how any substantive rights could be conferred upon accused persons as a result of the language quoted. This vagueness reduces the paper to mere precatory exhortation to be good and to be fair—amounting to no more than indoctrination of its employees by the Department of Justice.

The Department knows how to draft legislation conferring rights or imposing liabilities when it wants to do so. It cannot be done by paragraphs rife with limiting phrases such as "under normal circumstances"; "where no burden . . . or delay . . . is involved"; "reasonable requests"; "ordinarily"; "reasonable time"; "routine clear cases"; "might jeopardize"; "in appropriate cases"; or use of "encouraged" where "directed" would be more meaningful.

A reading of these sections suggests that when all is said and done, whether a "target" should be invited to testify is a matter addressed to the discretion of the United States Attorney. This is regarded by the Court as being declaratory of existing practice in the Office of the United States Attorney in this District. It is doubtful that there was any violation even of the "spirit" of these pious precatory exhortations, nor any departure here from customary practice. This defendant was indicted one week after he allegedly paid the $10,000 to Brooks, and before he knew that he was a

"target." This indictment was filed on the same day as six other indictments, all proceeding from the same undercover investigation. None of those targets were invited to appear before the grand jury. None was notified of his status as a suspect. This defendant and the others had been the subjects of extensive electronic recording of their conversations with Brooks and/or Rocoff.

No prosecutorial misconduct is shown, nor claimed. The prosecutors reasonably believed that a defendant in one of the other indictments might flee if given advance notice. They considered the matter and concluded not to comply with the procedure recommended in the USAM. As noted, there are more than enough exceptions, caveats, provisos and limiting adjectives in the guidelines as to make them practically worthless and illusory as a basis for seeking judicial interposition between the United States Attorney and his daily tasks. The authors of the USAM so intended, and so stated in the Introduction to the Manual.

At most, it can be said that now, aided by hindsight, there is an honest difference of opinion as to which course should have been pursued, and reasonable persons could differ. The Government argues that it was essential to file all the indictments arising out of the available evidence, at once, and without notice, because one of the other defendants had a potential for flight. It was reasonable for the prosecutor to believe that revelation of the investigation to this defendant, a reputable citizen, might lift the veil of secrecy. He or one of the other defendants might be inclined to tell members of his family and friends, lawyers and others, and the word might spread. It is not for this Court or for defendant to substitute their discretion and judgment for that which is entrusted to the United States Attorney by law, and almost two centuries of custom.

Reliance on the *Heffner-Caceres-Sourapas* doctrine is misplaced. In *Heffner*, a conviction for violation of 26 U.S.C. § 7205 was reversed because an Internal Revenue Agent failed to comply with internal procedures of the IRS equivalent to *Miranda*, required by an IRS newsrelease. In contrast with the USAM considered here, *Heffner* involved an absolute "instruction" to IRS Special Agents which was publicized as and considered by the agency to constitute a procedure for protecting the constitutional rights of persons suspected of criminal tax fraud. The directions were expressed in the language of legislators. Similarly, in *United States v. Caceres*, 545 F.2d 1182 (9th Cir. 1976), a tape recording was made by an IRS Agent in an interview with a person engaged in an attempt to bribe the Agent. The electronic surveillance was accomplished without prior administrative approval, as required by IRS regulations. These directions, quoted in fn. 1 in *Caceres, supra*, are sufficiently clear that they could reasonably be interpreted as intending to confer rights upon the objects of the surveillance. In those cases there was no express disclaimer of intention to confer rights, as is found in connection with the USAM.

We note in passing that in *United States v. Ruffin*, 575 F.2d 346 (2d Cir. 1978) the Court declined to dismiss an indictment because of non-compliance with a requirement for grand jury procedures which the Court of Appeals itself, purporting to exercise its supervisory powers, had imposed in *United States v. Jacobs*, 547 F.2d 772 (2d Cir. 1976), *cert. granted* 431 U.S. 937, 97 S.Ct. 2647, 53 L.Ed.2d 244 (1977). In *Jacobs*, the Court of Appeals required that grand jury targets be notified they were targets when called as witnesses. In *United States v. Ruffin, supra*, in which the *Jacobs* rule was violated, the Court merely suppressed the grand jury testimony, observing, (p. 353 n. 10 of 575 F.2d) "we recognize that at a certain point government misconduct may infect the indictment itself, such that suppression may be an inadequate remedy. See *United States v. Estepa*, 471 F.2d 1132 (2d Cir. 1972). This is not this case however." Reference to *Estepa* is itself of interest, for in that case, the Court of Appeals considered that the grand jury had been "misled" into " 'thinking it is getting eye-witness testimony from the agent, whereas it is actually

being given an account whose hearsay nature is concealed.' " That Court disposed of the problem by the following direction:

"[A] reversal with instructions to dismiss the indictment may help to translate the assurances of the United States Attorneys into consistent performance by their assistants. As Judge Medina said in his dissent in *United States v. Beltram, supra,* 388 F.2d at 453, 'This would not let appellants go scot free, as there would be time to reindict them and have their guilt or innocence passed upon again on a record not tainted with irregularity.' See *United States v. Ball,* 163 U.S. 662, 671–672, 16 S.Ct. 1192, 41 L.Ed. 300 (1896)."

Thereafter Estepa was indicted again, tried again, and convicted again.

We are then led to the question of what the sanction would be for such a failure to follow the USAM, if its directions had any teeth. The nearest analogy is probably *Estepa,* where in effect the Government was allowed to start the grand jury process all over again and did so. But see *United States v. James,* 493 F.2d 323 (2d Cir. 1974), in which the Court held that efforts of an Assistant United States Attorney in inducing a witness before the grand jury, later indicted, to fail to assert his right to counsel was activity which "can only be viewed as a cunning and successful device to induce him to answer all questions the examiner wished to put to him in disregard of his Fifth and Sixth Amendment rights." The court considered whether as a result James would be entitled to have the indictment dismissed, and concluded that he was not.

Lastly, defendant shows no prejudice as a result of the claimed violation of the USAM. With commendable candor, defendant has not suggested that if this indictment were dismissed and the Government were required to present the case anew to another grand jury, he actually would testify before that body, waiving his Fifth Amendment privilege, nor that on doing so he would have any relevant testimony to give.

For the foregoing reasons this branch of the motion is denied.

Count 1 is dismissed. In all other respects the motion is denied.

So Ordered.