**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Herbert S. WALDMAN, Defendant–
Appellant.**

No. 90–8784.

United States Court of Appeals,
Eleventh Circuit.

Sept. 18, 1991.

---

Jerome J. Froelich, Jr., McKenney & Froelich, Mark Spix, Spix, Krupp & Reece, Robert H. Hison, Hishon & Ranne, Dan R. Musick, Atlanta, Ga., for defendant-appellant.

Martin J. Weinstein, Asst. U.S. Atty., U.S. Dept. of Justice, U.S. Attorney's Office, Atlanta, Ga., for plaintiff-appellee.

Before JOHNSON and COX, Circuit Judges, and ENGEL*, Senior Circuit Judge.

JOHNSON, Circuit Judge:

Defendant Herbert Waldman appeals his convictions for a conspiracy to defraud the United States and to assist in the preparation of materially false tax returns, and for the primary offenses of assisting in the preparation of two false income tax returns as part of an alleged money laundering scheme. After due consideration, we affirm Waldman's convictions.

## I. STATEMENT OF THE CASE

### A. *Background Facts*

Between 1978 and 1980, Earl Griffin and his son, Michael Griffin, illegally imported marijuana into the United States through the Florida Keys. During this time, Earl Griffin obtained approximately $1.5 million from his drug business while Michael Griffin received in excess of $1.5 million.

Needing a mechanism to launder these drug proceeds, Earl Griffin was referred to Waldman sometime in 1979 by Gary Beller, an Atlanta real estate developer. Earl Griffin testified that he told Waldman that he possessed a large amount of undocumented cash which he obtained through

---

* Honorable Albert J. Engel, Senior U.S. Circuit Judge for the Sixth Circuit, sitting by designa-
tion.

gambling and that he was looking for legitimate investments. Earl Griffin testified that Waldman told him that Waldman could form an off-shore corporation which would receive Griffin's undocumented money and then send it back to a wholly-owned subsidiary in the United States, at which time "it would be clean money."[1] Waldman proceeded to establish a Liechtenstein corporation, PDC Politur, and a Georgia subsidiary, Politur Development Corporation ("Georgia Politur").[2] Earl Griffin also testified that Waldman demanded $175,000 in cash as payment for these services and that Waldman provided neither a bill for the services nor a receipt for the cash paid. In addition, Earl Griffin testified that he paid Waldman annual cash fees of around $40,000 for each of the next three years, for which no receipts were furnished. Earl Griffin further testified that, between 1979 and 1980, he transferred over $1 million in cash to Waldman to place in PDC Politur. According to Earl Griffin, Waldman told him never to buy anything in his own name because that would raise a "red flag" to the government. Finally, Earl Griffin testified that, at Waldman's suggestion, Earl Griffin became the President of Georgia Politur for which he received a salary "to make it look legal," yet he performed no services for Georgia Politur in exchange for the salary.

Michael Griffin testified that, in 1979, sometime after his father became a client of Waldman, he approached Waldman to form foreign corporations to enable him to spend a substantial amount of cash which he possessed. For Michael Griffin, Waldman established similar Liechtenstein corporations,[3] Immobilien Grund and Bau ("Immobilien") and Schiffahrt Holding ("Schiffahrt"), as well as a Georgia subsidiary, Griffin Investment. Michael Griffin testified that Waldman charged a setup fee of approximately $70,000 to $100,000, and subsequent annual fees of approximately $30,000. He further stated that these fees were paid in cash and that Waldman provided no bills or receipts.[4] Michael Griffin testified that he and Waldman discussed how this structure would "clean up" Michael Griffin's money so that purchases could be made in the United States without the Internal Revenue Service ("IRS") knowing that he was the beneficial owner of the things nominally purchased by the off-shore corporation. Michael Griffin also testified that Waldman explicitly advised him not to purchase anything in his own name, because that would raise a "red flag" to the IRS.[5] In keeping with this advice, Waldman arranged for Immobilien to purchase a house in Fort Lauderdale ("the Mustang property") for the benefit of Michael Griffin. Waldman then prepared a contract between Immobilien and Michael Griffin whereby Immobilien nominally employed Griffin as the caretaker for the Mustang property. Michael Griffin testified that he was paid $500 per week for this job, but that he performed no services for the salary.[6] Finally, according to Michael Griffin, in 1983 Waldman advised him and his wife, Susan Griffin, to draw salaries from Griffin Investment as President and Vice President, respectively, to give the appearance of legitimacy. Michael and Susan Griffin followed that advice, but

---

1. Waldman, however, testified that Earl Griffin asked him to form foreign corporations to help him achieve tax savings on income he received as the owner of a major contracting company.

2. At the time, Liechtenstein law permitted beneficial owners of Liechtenstein corporations to remain secret.

3. During the grand jury investigation, Michael Griffin agreed to testify against Waldman as part of a plea agreement wherein the government agreed not to indict his wife, Susan Griffin, his father, Earl Griffin, and his brother-in-law, Richard Helton.

4. When Waldman transported money overseas for Earl and Michael Griffin, he always took the money in cash form.

5. Waldman testified that he never discussed hiding income from the IRS with Michael Griffin.

6. Waldman contends that Michael Griffin was employed as a consultant on the reconstruction of the Mustang property. It is true that improvements were made on the Mustang property; however, the record reflects that Michael Griffin's role in these improvements was limited to paying for some of the materials and labor.

they never did any work for Griffin Investment.

Both Earl and Michael Griffin testified that Waldman made most of the operational and investment decisions regarding their corporations. Through Waldman, the Griffins' corporations invested in a number of real estate projects in Georgia. The other partners in these real estate projects testified that they dealt solely with Waldman on these investments and that Waldman told them that the foreign corporations represented Swiss doctors and lawyers. Indeed, Earl Griffin testified that he once went to the site of one of his investments, an apartment complex, where Waldman introduced him as a potential buyer of one of the apartments, not as a partner in the project. Similarly, Michael Griffin testified that Waldman advised him to conceal his identity when he visited the site of one of his investments.

Waldman testified that he established the foreign corporations relying on the advice of an expert tax accountant, Sol Spielberg, and a lawyer from Liechtenstein, Alex Wiederkehr. Wiederkehr, however, testified that all transactions by PDC Politur, Immobilien, and Schiffahrt were done at the instruction of Waldman. Wiederkehr also stated that all monies repatriated to the United States from these corporations were sent to accounts controlled by Waldman.

On Waldman's instruction, Michael Griffin hired Sol Spielberg's firm, Spielberg & Herman, to prepare the 1983 and 1984 income tax returns for himself and his wife, Susan. According to the testimony of IRS Agent Joseph Garcia, these tax returns failed to reflect that Michael Griffin was the beneficiary of two foreign trust corporations. The returns also reported some of Michael Griffin's marijuana smuggling proceeds from 1979 as salary income from Griffin Investment in 1983 and as income from real estate commissions and interest in 1983 and 1984.

## B. *Procedural History*

On March 23, 1990, a federal grand jury returned an indictment which charged Waldman with three counts relating to money laundering. Count One accused Waldman of conspiring to do two things: (1) defraud the United States by impeding and impairing the IRS through concealment of the amount and source of Michael Griffin's income for 1979, and (2) assist, aid, or counsel the preparation of materially false tax returns,[7] both in violation of 18 U.S.C.A. § 371.[8] Counts Two and Three alleged that Waldman had committed the substantive offense of willfully assisting or counselling Michael and Susan Griffin in the preparation of their materially false 1983 and 1984 income tax returns in violation of 26 U.S.C.A. § 7206(2).[9] At the close of the government's case, Waldman moved for acquittal, but the district court denied the motion. The jury returned a guilty verdict on all three counts. The district court sentenced Waldman to three years imprisonment on each count. The court, however, suspended the prison sentences on Counts Two and Three, but placed Waldman on five years probation and fined him $350,000 for those counts.

## II. ANALYSIS

Waldman argues that Count One was barred by the applicable statute of limitations and assails portions of the government's questioning and closing argument as prosecutorial misconduct.

7. This second alleged object of the conspiracy constitutes a violation of 26 U.S.C.A. § 7206(2), the statute involved in the remaining two counts. *See infra* note 9 (text of section 7206(2)).

8. Section 371 makes it unlawful to "conspire either to commit any offense against the United States, or to defraud the United States ... in any manner or for any purpose." 18 U.S.C.A. § 371 (West 1966).

9. Section 7206(2) states that anyone who "[w]illfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return ... which is ... false as to any material matter" will be guilty of a felony. 26 U.S.C.A. § 7206(2) (West 1989).

### A. Statute of Limitations

■ Waldman claims the district court erred in holding that the limitations period applicable to Count One was the six year period provided in 26 U.S.C.A. § 6531.[10] Count One of the indictment alleges a conspiracy under 18 U.S.C.A. § 371 with two alternative objects: to defraud the United States and to assist in the preparation of materially false tax returns in violation of 26 U.S.C.A. § 7206(2). Waldman contends that the limitations period is five years pursuant to *Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957). The Supreme Court, in *Grunewald*, held that the general statute of limitations for non-capital offenses, 18 U.S.C.A. § 3282,[11] governed a section 371 conspiracy to fix tax fraud trials. *Id.*, at 396 n. 8, 77 S.Ct. at 969 n. 8. Similar results were reached in two Second Circuit cases of the same vintage, *United States v. Witt*, 215 F.2d 580 (2d Cir.), *cert. denied sub nom., Talanker v. United States*, 348 U.S. 887, 75 S.Ct. 207, 99 L.Ed. 697 (1954), and *United States v. Klein*, 247 F.2d 908 (2d Cir.1957), *cert. denied*, 355 U.S. 924, 78 S.Ct. 365, 2 L.Ed.2d 354 (1958).[12] We disagree with appellant's theory and hold that the period of limitations for both the fraud and the section 7206(2) prongs of the conspiracy is six years.

As a preliminary matter, we find that *Grunewald*, *Witt*, and *Klein* do not control this issue. We hereby adopt the reasoning that was first set forth in *United States v. Lowder*, 492 F.2d 953 (4th Cir.), *cert. denied*, 419 U.S. 1092, 95 S.Ct. 685, 42 L.Ed.2d 685 (1974), and was developed further in *United States v. Williams*, 649 F.Supp. 1290 (M.D.Fla.1986). Referring to the statute of limitations holdings in *Grunewald* and *Klein*, the *Lowder* court observed:

> [T]he language was not part of the main holdings in either case; it was not with respect to any issue which was fully briefed and pressed; and it seems nothing more than mere inadvertence on the part of both courts that the specific language of § 6531, and its predecessors, was overlooked.

*Lowder*, 492 F.2d at 956. The *Williams* court pointed out three additional reasons to believe that the Supreme Court in *Grunewald* was unaware of the predecessor of section 6531. First, the applicable provision (now subsection (8)) was "somewhat submerged in a separate, unnumbered paragraph." *Williams*, 649 F.Supp. at 1292. Second, although the *Grunewald* defendants were charged under section 371, the predecessor of section 6531(8) referred instead to "section 37 of the Criminal Code," which had been repealed and replaced by section 371. *Id.* Finally, "[t]he most telling indication that the *Grunewald* court overlooked the predecessor to [section] 6531 is its failure to cite, let alone distinguish or overrule, the prior decision of *Braverman v. United States*, 317 U.S. 49 [63 S.Ct. 99, 87 L.Ed. 23] (1942)." *Williams*, 649 F.Supp. at 1292.

The *Braverman* court set forth what we believe to be the correct way to interpret section 6531(1) and (8). Subsection (1) applies only to " 'offenses [arising under the

---

**10.** Section 6531 provides, in pertinent part:

No person shall be prosecuted ... for any of the various offenses *arising under the internal revenue laws* unless the indictment is found ... within 3 years next after the commission of the offense, except that the period of limitation shall be 6 years—
(1) for offenses involving the defrauding or attempting to defraud the United States ..., whether by conspiracy or not, and in any manner; ... and
(8) for offenses arising under section 371 of Title 18 of the United States Code, where the object of the conspiracy is to attempt in any manner to evade or defeat any tax or the payment thereof.

26 U.S.C.A. § 6531 (West 1989) (emphasis supplied).

**11.** Section 3282 provides: *"Except as otherwise provided,* no person shall be prosecuted ... for any offense, not capital, unless the indictment is found ... within five years next after such offense shall have been committed." 18 U.S.C.A. § 3282 (West 1985) (emphasis supplied).

**12.** The Second Circuit has recently characterized the statute-of-limitations holdings in *Grunewald* and in its own cases of *Witt* and *Klein* as "simply pure oversight." *United States v. Ingredient Technology Corp.*, 698 F.2d 88, 99 (2d Cir.), *cert. denied*, 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983).

internal revenue laws] involving the defrauding or attempting to defraud the United States.'" *Braverman*, 317 U.S. at 54, 63 S.Ct. at 102 (quoting predecessor to section 6531; current version uses same language). *See also United States v. Scharton*, 285 U.S. 518, 52 S.Ct. 416, 76 L.Ed. 917 (1932); *United States v. McElvain*, 272 U.S. 633, 47 S.Ct. 219, 71 L.Ed. 451 (1926). With regard to subsection (8), however,

> it is not necessary that the conspiracy have as its object the commission of an offense in which defrauding or attempting to defraud the United States is an element. It is enough that the conspiracy involves an attempt to evade or defeat the payment of federal taxes.[13]

*Braverman*, 317 U.S. at 55, 63 S.Ct. at 102.

Therefore, we hold that, insofar as Count One charged a conspiracy to defraud the United States by impeding the Internal Revenue Service, subsection (1) of section 6531 applies; the period of limitations is six years; and the count is not barred.[14] Several other cases lend support to this view. *United States v. Ingredient Technology Corp.*, 698 F.2d 88, 98–99 (2d Cir.1983) (both subsections (1) and (8) applicable to tax fraud conspiracy); *United States v. White*, 671 F.2d 1126, 1133–34 (8th Cir. 1982) (same); *United States v. Brunetti*, 615 F.2d 899, 901–02 (10th Cir.1980) (same); *United States v. Fruehauf Corp.*, 577 F.2d 1038, 1069–70 (6th Cir.) (only subsection (1) applicable to tax fraud conspiracy), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978); *United States v. Lowder*, 492 F.2d 953, 955–56 (4th Cir.1974)

(same); *United States v. Williams*, 649 F.Supp. 1290, 1291–92 (M.D.Fla.1986) (same as *Ingredient Technology*).

We further hold that, insofar as Count One charged a conspiracy to violate section 7206(2), subsection (8) applies; the period of limitations is six years; and the count is not barred.[15] We find support for this conclusion in two cases. *Braverman*, 317 U.S. at 54–55, 63 S.Ct. at 102 (predecessor to subsection (8) did not require fraud element, just general attempt to evade taxes); *White*, 671 F.2d at 1133–34 (emphasized words, "in any manner," in subsection (8), implying approval of *Braverman* theory of broad applicability of subsection (8) to nonfraudulent tax evasion conspiracies). *But cf. Fruehauf*, 577 F.2d at 1070 (section 7206(2) conspiracy period of limitations either five years, pursuant to 18 U.S.C.A. § 3282, or six years, under section 6531(3) which applies to primary violation of section 7206(2)).

### B. *Prosecutorial Misconduct*

Waldman accuses the government of misconduct in three parts of the trial: in the presentation of witness testimony, in its cross-examination of Waldman himself, and in its closing remarks. First, Waldman contends that the government improperly sought testimony from Jay Solowsky regarding Waldman's alleged decision to abandon the defense of the Mustang property in a forfeiture proceeding. This testimony tended to show that Waldman abandoned the property in order to continue to conceal the connection between Michael Griffin and the Mustang property. Wald-

---

**13.** Some language in subsection (8) ("attempt in any manner to evade or defeat") is similar to the operative words of 26 U.S.C.A. § 7201 which makes it unlawful to *"willfully* attempt[ ] in any manner to evade any tax." (emphasis added). One could read subsection (8), then, as applying only to conspiracies to violate section 7201; however, we decline to do so for two reasons. First, subsection (8) does not *exactly* track the language of section 7201; subsection (8) omits the word "willfully." More importantly, the only Supreme Court case to fully address the issue, *Braverman*, interpreted what is now subsection (8) more broadly to apply to a conspiracy to violate not section 7201 or its predecessor, but several different *liquor* tax laws. *Braverman*, 317 U.S. at 50 n. 1, 63 S.Ct. at 100 n. 1.

Therefore, subsection (8) applies to all section 371 conspiracies the object of which is to attempt an offense which, in common parlance, connotes tax evasion unless fraud is a necessary element of the offense. In section 371 tax conspiracies where fraud is a necessary element subsection (1) applies.

**14.** The grand jury handed down the indictment on March 23, 1990, and the district court properly instructed the jury that, unless they found an overt act after March 24, 1984, Count One was barred.

**15.** *See supra* note 14.

man claims that the government knew, or should have known, that another lawyer, independent from Waldman, made the decision to abandon the property. Second, Waldman argues that the government wrongfully cross-examined him by soliciting testimony regarding his assertion of attorney-client privilege on behalf of his client, Earl Griffin, at a grand jury proceeding. Finally, Waldman contends that the government, in its closing argument, improperly suggested that Waldman had already been found guilty when it told the jurors that the grand jury consisted of "people just like yourselves."

In *United States v. Weinstein*, 762 F.2d 1522 (11th Cir.), *modified on other grounds, reh'g denied*, 778 F.2d 673 (1985), *cert. denied*, 475 U.S. 1110, 106 S.Ct. 1519, 89 L.Ed.2d 917 (1986), this Court held that a successful claim of prosecutorial misconduct requires misconduct " 'so pronounced and persistent that it permeates the entire atmosphere of the trial.' " *Id.* at 1542 (quoting *United States v. Alanis*, 611 F.2d 123, 126 (5th Cir.), *cert. denied*, 445 U.S. 955, 100 S.Ct. 1607, 63 L.Ed.2d 791 (1980)). Moreover, the district court may render misconduct harmless by delivering a curative instruction to the jury. *Id.*

■ With regard to the first incident, Solowsky's testimony about the forfeiture, the record reflects that, during a colloquy outside the hearing of the jury, Waldman's attorney warned the prosecutor and the court that the forfeiture defense was abandoned not by Waldman but rather by a different and independent attorney then representing Michael Griffin. After the prosecutor assured the court that he believed Solowsky would testify that it was indeed Waldman who abandoned the forfeiture, the court allowed the government to call Solowsky. On direct examination, the government established only that Waldman had represented Michael Griffin when Griffin purchased the Mustang property and that Griffin had abandoned the forfeiture proceedings; however, the government never explicitly asked, and Solowsky never explicitly stated in his direct examination, who represented Griffin at the forfeiture proceedings. The direct examination implied that Waldman advised the abandonment. The trial court, however, struck the testimony after cross-examination revealed that the forfeiture was conducted by counsel independent of Waldman. We find that cross-examination and the trial court's curative instruction rendered any alleged misconduct with regard to Solowsky's testimony harmless.

■ Regarding the second incident, the government's cross-examination of Waldman that elicited testimony revealing Waldman's assertion of attorney-client privilege, we are aware of no court which has equated this privilege with the Fifth Amendment privilege against self-incrimination, and we are not inclined to be the first. "Taking the Fifth" can be explained only as a tactic to conceal one's culpability, such that inherent and incurable prejudice arises. Assertion of attorney-client privilege, however, can be explained on cross-examination and in closing remarks as an attorney's ethical obligation from which no inference of guilt can logically be derived. We, therefore, find no misconduct in the elicitation of Solowsky's testimony regarding Waldman's assertion of attorney-client privilege.

■ Finally, we believe the government's reference to the grand jury during its closing must be taken in context. By the reference, the government sought to refute the defense's implication that the government had manipulated the evidence. The reference to the grand jury was indeed inapt and certainly carried with it the possibility of prejudice. The district court, however, quickly and effectively rendered harmless the government's mischaracterization of the grand jury process by carefully circumscribing the prosecutor's argument and by giving a curative instruction. We therefore find all of Waldman's claims of prosecutorial misconduct meritless.[16]

16. Waldman raised two other grounds for reversal before this Court. First, Waldman claims that the government's evidence of willfulness was insufficient to support the verdict on Counts Two and Three. We find this argument meritless. *See United States v. Hooshmand*, 931

## III. CONCLUSION

For the foregoing reasons, we AFFIRM Waldman's convictions.

F.2d 725, 733 (11th Cir.1991) (stating standard of review for sufficiency of evidence in criminal case). Second, Waldman claims that the charge to the jury was insufficient with regard to Count One. Waldman failed to object to the instruction at trial, and we find no plain error.