Ray MARSHALL, Secretary of Labor

v.

BAPTIST HOSPITAL, INC.

No. 75–367–NA–CV.

United States District Court,
M. D. Tennessee,
Nashville Division.

April 25, 1979.

Marvin M. Tincher, Regional Atty., Ralph D. York, Trial Atty., and Robert C. Haynes, U.S. Dept. of Labor, Nashville, Tenn., for plaintiff.

John R. Trapnell, Atlanta, Ga., for defendant.

## MEMORANDUM

MORTON, Chief Judge.

The Secretary of Labor brought this action under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201, *et seq.* (hereinafter "the Act" or "the FLSA"), alleging that defendant Baptist Hospital, Inc., violated the Act's minimum wage, overtime compensation, and recordkeeping provisions, respectively sections 6, 7, and 11(c) of the Act, 29 U.S.C. §§ 206, 207, and 211(c). Plaintiff seeks back wages on be-half of trainees in radiologic technology for hours worked at the hospital from October 21, 1972, three years preceding the filing of this suit, to the present. The Secretary also asks that defendant be enjoined from further violations of the Act. This court has jurisdiction under section 17 of the Act, 29 U.S.C. § 217.

Defendant, Baptist Hospital, Inc., is a Tennessee corporation with its principal place of business at 2000 Church Street, Nashville, Tennessee, where it is engaged in the operation of a 600-bed general short-stay hospital. The hospital has numerous departments, including a Department of Radiology.

In 1967 the FLSA was amended to extend its applicability to a variety of types of institutions, including hospitals.[1] Baptist Hospital has been aware of the applicability of the Act and its monetary and record-keeping provisions since that time.[2]

The business activities of the defendant were and are for a common business purpose. The hospital is engaged in commerce or in the production of goods for commerce within the meaning of section 3(s) of the Act, 29 U.S.C. § 203(s), having employees engaged in commerce or in the production of goods for commerce, including employees handling, selling or otherwise working on goods that have been moved in or produced for commerce.

---

1. The Fair Labor Standards Amendments of 1966 were enacted September 23, 1966 (Pub.L. No.89–601, 80 Stat. 830), and became effective February 1, 1967. Section 3(s) of the Act, 29 U.S.C. § 203(s), was amended to provide:

"Enterprise engaged in commerce or in the production of goods for commerce" means an enterprise which has employees engaged in commerce or in the production of goods for commerce, or employees handling, selling or otherwise working on goods or materials that have been moved in or produced for commerce by any person, and which—

\* \* \* \* \* \*

(4) is engaged in the operation of a hospital, an institution primarily engaged in the care of the sick, the aged, the mentally ill or defective who reside on the premises of such institution, a school for mentally or physically handicapped or gifted children, a preschool, an elementary or secondary school, or an institution of higher education (regardless of whether or not such hospital, institution or school is public or private or operated for profit or not for profit). . . .

2. It is a member of the American Hospital Association and of the Tennessee Hospital Association, which associations regularly advised its members, including Baptist Hospital, on matters pertaining to compliance with the Act. In addition, the hospital has regularly subscribed to the Bureau of National Affairs (BNA) Labor Service which publishes court decisions pertaining to the Act and opinion letters of the Administrator of the Wage and Hour Division. The Vice President of Personnel for the hospital testified that he was employed by Baptist Hospital since 1968 and that he was aware of the applicability of the Act to hospitals.

## I. ISSUES PRESENTED

The Secretary, through· his authorized representatives in the Wage and Hour Division of the Department of Labor, contends that an employer—employee relationship existed between Baptist Hospital and trainees in radiologic technology who were engaged in "practicum" or "clinical" training in the hospital's Department of Radiology. Trainees worked at the hospital as part of a two-year program that was originally sponsored and administered by Vanderbilt University Hospital but that was taken over by Aquinas Junior College in September of 1974. Baptist Hospital was one of several hospitals in the Nashville, Tennessee, area participating in the program by providing practicum training both before and after the change in sponsorship. The program included classroom study as well as clinical work, but the classes were held at Vanderbilt or Aquinas, and the Secretary does not seek back wages for the hours spent in class.

The threshold and predominant issue presented by this case is, of course, whether the relationship between the hospital and the trainees was a relationship of employment within the meaning of the Act. For the reasons set out in part II herein, the court finds that such a relationship did exist. This conclusion raises the additional issue of whether the hospital is entitled to the protection against liability afforded employers by the Portal to Portal Act of 1947, 29 U.S.C. §§ 251–262. Section 10 of this Act, 29 U.S.C. § 259, bars the punishment or liability of employers whose violations of the Fair Labor Standards Act were committed in good faith and in reliance upon and conformity with certain types of administrative pronouncements. Inasmuch as the court finds against defendant on this question, as discussed in part III, *infra*, still a third issue is presented: whether the applicable period under the statute of limitations, section 6 of the Portal to Portal Act, 29 U.S.C. § 255, is the normal two years or the three year period provided for "willful" violations. This matter too is decided against the hospital, for reasons set out in part IV of the opinion.

## II. EMPLOYMENT RELATIONSHIP

### A. *Legal Principles*

The definition of "employee" provided in the Act is virtually circular: "the term 'employee' means any individual employed by an employer." 29 U.S.C. § 203(e)(1). Other definitions are only slightly more helpful, the Act stating that " 'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee . . .," 29 U.S.C. § 203(d), and that " '[e]mploy' includes to suffer or permit to work." 29 U.S.C. § 203(g). This vagueness was not inadvertent, however, but was intended to divest the terms of conventional limitations and technical concepts in order to insure broad and "commonsensical" application of the Act's protections. *See, e. g., NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 129, 64 S.Ct. 851, 88 L.Ed. 1170 (1944); *Powell v. United States Cartridge Co.,* 339 U.S. 497, 523, 70 S.Ct. 755, 94 L.Ed. 1017 (1950). In the *Hearst* case the Court specifically rejected the argument that the broad language of the Act's definitions reflected a congressional intent to import common law principles, holding instead that Congress meant for "doubtful situations" to be determined by "underlying economic facts." *NLRB v. Hearst Publications, Inc., supra,* 322 U.S. at 129, 64 S.Ct. 851. The Court reiterated and amplified this position in a string of subsequent cases:

> Our decisions have made one thing clear about the Fair Labor Standards Act: its applicability is not fixed by labels that parties may attach to their relationship nor by common law categories nor by classifications under other statutes. *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772; *Walling v. Portland Terminal Co.,* 330 U.S. 148, 150, 67 S.Ct. 639, 91 L.Ed. 809; [other citations omitted].

*Powell v. United States Cartridge Co., supra,* 339 U.S. at 528, 70 S.Ct. at 771. The "economic reality test," as it came to be known, requires a court to examine the

"circumstances of the whole activity" rather than "isolated factors." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730, 67 S.Ct. 1437, 91 L.Ed. 1772 (1947), and this is true regardless of whether the persons alleged to be "employees" might otherwise (or also) be labeled "independent contractors" as in *Rutherford Foods, supra; Mednick v. Albert Enterprises, Inc.*, 508 F.2d 297 (5th Cir. 1975); "member of a cooperative" as in *Goldberg v. Whitaker House Cooperative, Inc.*, 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961); "prisoners" as in *Sims v. Parke-Davis Co.*, 334 F.Supp. 774 (E.D. Mich.1971); "conscientious objectors" as in *Isaacson v. Penn Community Services, Inc.*, 450 F.2d 1306 (4th Cir. 1971); "patients" as in *Souder v. Brennan*, 367 F.Supp. 808 (D.D. C.1973); "apprentices" as in *Ballou v. General Electric Co.*, 433 F.2d 109 (1st Cir. 1970), and *Bailey v. Pilots' Association*, 406 F.Supp. 1302 (E.D.Pa.1976); or "trainees" as in *Ballou, supra, Wirtz v. Wardlaw*, 339 F.2d 785 (4th Cir. 1964), and the instant case. As with any meaningful test, outcomes have varied under the "economic reality" standard. The results were positive for an employment relationship in *Rutherford Foods, Mednick, Goldberg, Souder, Bailey,* and *Wirtz,* but negative in *Sims, Isaacson,* and *Ballou.* In none, however, did the label control; [3] rather the courts considered the facts of each situation in specific detail before reaching a conclusion, a process this court must likewise employ.

The "evils" the Act was designed to prevent, and which furnish the perspective from which the facts must be examined, are the displacement of regular employees or applicants and the exploitation of unorganized laborers. *See Isaacson, supra,* at 1310.

In examining a training or learning situation for possible signs of these "evils," it is relevant to assess the validity of the program as an educational experience. It is also important in such cases to determine whether the primary benefit from the relationship flows to the learner or to the alleged employer.[4]

---

**3.** This is not to say that labels have not ever controlled, or at least appeared to control, a court's finding. For example, in *Bobilin v. Board of Education*, 403 F.Supp. 1095 (D.Haw. 1975), the court's implication that public school students subjected to rather extensive and surely repetitious cafeteria duty received sufficient educational value therefrom to preclude an employment relationship has no foundation other than a determination that students are just students. The court, ignoring the issue of displacement of regular employees by the student-workers, cites the following language from *Walling v. Portland Terminal Co.,* 330 U.S. 148, 67 S.Ct. 639, 91 L.Ed. 809 (1947) to support its finding:

> "The definition of 'suffer or permit to work' was obviously not intended to stamp all persons as employees who, without express or implied compensation agreement, might work *for their own advantage* on the premises of another. Otherwise, all students would be employees of the school or college they attended, and as such entitled to receive minimum wages. . . ."

*Bobilin, supra,* at 1106 (quoting *Walling v. Portland Terminal Co., supra,* 330 U.S. at 152, 67 S.Ct. 639) (emphasis added by this court).

It is the opinion of this court that the *Portland Terminal* dictum was intended to point out the absurdity of regarding as employment a student's regular school work performed primarily for its educational value. Thus students required to perform a limited amount of varied cafeteria duty as an integrated part of a planned course of study in, for example, home economics should not be regarded as employees.

**4.** Other factors particularly significant in learning situations are whether the trainees or students are necessarily entitled to a job at the conclusion of the training period, and whether there is a mutual agreement that the trainees are not entitled to wages for the time spent in training. It would, however, be contrary to the purposes of the Act, particularly the deterrence of exploitation of unorganized workers, to accord undue weight to the absence of an agreement as to future employment or as to wages during training as indicia of a nonemployment relationship. Courts have demonstrated in a variety of contexts that the absence of an express or implied employment agreement will not defeat an employment relationship. *See, e. g., Bailey v. Pilots' Association,* 406 F.Supp. 1302 (E.D.Pa.1976); *King v. Carey,* 405 F.Supp. 41 (W.D.N.Y.1975); *Weidenfeller v. Kidulis,* 380 F.Supp. 445 (E.D.Wis.1974); *Souder v. Brennan,* 367 F.Supp. 808 (D.D.C.1973); *Wyatt v. Stickney,* 344 F.Supp. 373 (M.D.Ala.1972). An employment relationship has also been found where there was a mutual understanding that the employer would pay no compensation. *See, e. g., Mednick v. Albert Enterprises,* 508 F.2d 297 (5th Cir. 1975); *Southern Railway v. Black,* 127 F.2d 280 (4th Cir. 1942).

Perhaps the best expression of the latter factor is *Bailey v. Pilots' Association, supra,* where the court found that the defendant had "derived *the primary, immediate and substantial benefit* from the Plaintiff's work" even though the plaintiff, an apprentice, had received "some educational benefit," including the fulfillment of a licensing requirement. 406 F.Supp. at 1305 (emphasis added).[5] The allocation of primary benefit is pertinent even where the alleged employer is a nonprofit corporation, as in the instant case.[6]

### B. Facts and Conclusions

#### 1. The Program

Beginning in the late 1930's, Vanderbilt Hospital of Nashville conducted a program for the training of X-ray technologists in its own X-ray department. In 1968 the decision was made to expand the program by involving other hospitals. A meeting was held with representatives of a number of hospitals present, including defendant Baptist Hospital. Defendant, which prior to that time had conducted its own program for the training of X-ray technologists, agreed to participate in the program.

Under the program as expanded in 1968, all classroom activity was conducted at Vanderbilt University Hospital with practicum training being conducted at each of the participating hospitals' X-ray departments. The program director was James W. Hamlin, and the assistant director was Dianne A. George. Hamlin and George were primarily responsible for coordinating the activities of the trainees both in their classroom and in their practicum activities.

Persons were selected to enter the two-year program upon application to Vanderbilt University Hospital. A new class was enrolled annually, with training beginning in July of each year. After selection, each person was immediately assigned to one of the participating hospitals' X-ray departments for clinical practicum training.

During the first year of training, classes in academic subjects including anatomy and

---

**5.** In acknowledging that the definitions of "employ" and "employee" under the Act are broad, the Supreme Court stated that "broad as they are, they cannot be interpreted so as to make a person whose work serves *only* his own interest an employee of another person who gives him aid and instruction." *Walling v. Portland Terminal Co., supra,* 330 U.S. at 152, 67 S.Ct. at 641 (emphasis added). This point was emphasized by the Fourth Circuit in holding that certain trainees were employees: "This case is not like, *Walling v. Portland Terminal Co.,* 330 U.S. 148, 67 S.Ct. 639, 91 L.Ed. 890 (1947), where it was held that workers whose efforts served their own interests exclusively and did not expedite and in fact impeded the business enterprise were not 'employees.' Here, Wardlaw [the employer], no less than Lynch and Partin [the employees] themselves, benefited from their labors." *Wirtz v. Wardlaw, supra,* 339 F.2d at 787-88. While the above language from *Wardlaw* and *Portland Terminal Co.* would, if taken to extreme, indicate an employment relationship where the alleged employer derives any benefit at all, this would not, of course, comport with the flexibility of the "economic realities" test.

**6.** In *Isaacson v. Penn Community Services, Inc., supra,* the court stated that:

While we cannot say that Penn Community received no benefit from plaintiff's services, we first note that . . . Penn Community is a nonprofit corporation and its corporate purposes are the public good in the community in which it operates. In the broad sense, therefore, any benefit to Penn Community was benefit to the public at large—a benefit of a different nature than that of a for-profit enterprise. Particularly is this true because . . . Penn Community created the position occupied by plaintiff to accommodate plaintiff . . . .

More importantly, we think that the *primary* benefit of the relationship was to plaintiff . . . .

450 F.2d at 1309–10 (emphasis added).

Defendant relies on the second sentence of the above quotation for the proposition that any benefit received by the hospital from the radiologic trainees inured to the public and thus should not be regarded as an indication of an employment relationship. Such an extreme view is belied by the language that follows in *Isaacson* itself. Moreover, this reasoning would apply to the benefits derived from a nonprofit corporation from any employee, and yet such institutions have been expressly made subject to the FLSA. *See* note 1, *supra*. What *Isaacson* does suggest is that a *for*-profit corporation receiving substantial but less than primary benefit from the services of trainees is more likely to be an employer within the meaning of the FLSA than is a nonprofit institution in like circumstances.

physiology, nursing procedures, orientation, radiographic technique, radiographic positioning, and others were scheduled for a total of approximately nine hours per week. During the second year, the program provided for approximately six hours of classroom training in academic subjects to include dark room chemistry, radiotherapy, special procedures and processes, radiation and protection, radiographic technique, radiographic positioning and others. Classes were scheduled in the afternoons between 1:30 p. m. and 4:30 p. m., but prior to June 1973 classroom attendance was not required. Tr. Exh. 63, at 7, 25 and 73.

Those who successfully completed the two-year course were granted certificates of completion from Vanderbilt University Hospital. Graduates also were eligible to take the Board examination given by the American Registry of Radiologic Technologists for certification as Radiologic Technologist. Persons who pass this examination are entitled to use the designation "RT" after their names.

Trainees were not charged tuition by Vanderbilt University Hospital, and were paid a stipend of $100 per month during their second year in the program. During both years of enrollment, trainees received Blue Cross/Blue Shield medical insurance, and laundry services were provided for uniforms worn during the period of the training program. The stipends and medical insurance premiums were paid directly by Vanderbilt University Hospital, which then billed each participating hospital for these items. Baptist Hospital reimbursed Vanderbilt the amounts of the stipends and insurance premiums. The entire program was financed exclusively by federal grant.

Before 1973 the program policy was that persons in the program were to be rotated on a 3-month basis between participating hospitals, including Baptist Hospital, to receive their clinical training. In June 1973 this policy was changed, and trainees were assigned to a hospital for periods of one year for clinical practicum training. In 1974 the policy was again changed, and they were assigned to one hospital for their entire two years of practicum training.

The program sponsored by Vanderbilt University Hospital was accredited by the Joint Review Committee on Education in Radiologic Technology. It is the function of this committee to pass on the qualifications of radiologic technology training programs and then to make recommendations to the Council on Medical Education of the American Medical Association. A request was made in 1973 by the Division of Allied Health Professions, Vanderbilt University, to the accreditation agency to allow it to sponsor the program then existing at Vanderbilt University Hospital. After a site visit to Vanderbilt and the affiliated hospitals including Baptist by three members of the Joint Review Committee, the proposed sponsorship of the program by Division of Allied Health Professions, Vanderbilt University, was not approved. The Committee notified Dr. Richard O. Cannon, Dean, Division of Allied Professions, Vanderbilt University, of its decision to recommend nonapproval by letter dated December 7, 1973. See Exh. 3 to Stipulation of Facts filed November 19, 1976. The following reasons, among others, were given for nonapproval of the application: (1) There was no evidence of guidance, leadership or coordination between Vanderbilt University Hospital and the other three affiliates, one of which was Baptist; (2) on occasion, affiliating hospitals withheld students from class attendance if their services were needed in the X-ray department; (3) the rotation of students through the affiliating hospitals was not based on any sound educational objectives or planning of the clinical experience; and (4) no advisory committee had been formed to provide guidance and evaluation for the program.

During the same 1973 site visit by representatives of the Joint Review Committee, the program as conducted through Vanderbilt University Hospital was also considered. On December 7, 1973, the Committee notified Dean Cannon that it had voted to recommend probation of the program for the same reasons it decided to recommend nonapproval of the application for sponsor-

ship of the program by the Vanderbilt University Division of Allied Health Professions. *See* Exh. 4 to Stipulation of Facts filed November 19, 1976.

The Vanderbilt University Hospital program continued on probation until the last person enrolled in that program was graduated in June 1975. The last class was accepted by the Vanderbilt University Hospital program in July 1973 and was graduated in June 1975. After that time, Vanderbilt University Hospital School of Radiologic Technology ceased to operate.

The foregoing is an overview of the scope of the program as it existed under the sponsorship of Vanderbilt University Hospital. As noted in part I, *supra*, the Radiologic Technology program has been sponsored and administered by Aquinas Junior College since September 1974.[7] Aquinas is also located in Nashville and, as the name implies, is a junior college. It offers a course in Radiologic Technology, which is generally described on pages 40 through 43 of its 1976 catalog. Exh. 5 to Stipulation of Facts, filed November 19, 1976. It is affiliated with the Division of Allied Health Professions, Vanderbilt University, which provides funds for the operation of the program and coordination of clinical practicum training. Dianne A. George presently serves as program coordinator, and she has direct responsibility for the functioning of the program, serving as instructor and coordinator between the Junior College, Vanderbilt University, and the participating hospitals, including Baptist Hospital. James Hamlin is presently her assistant. The Aquinas program differs from the Vanderbilt Hospital program in that it is designed to provide an associate degree to the enrollees, who are required to take academic courses in accordance with the Junior College curriculum policy. However, the requirement for practicum training in the hospitals continues, and according to Dick Hatchell, De-

partment Head and Chief Radiologic Technologist at Baptist Hospital, there has been no change in the practicum training administered by Baptist Hospital subsequent to the change in sponsorship of the program.

Prior to January 1973, trainees were expected to spend up to 44 hours per week in classroom and practicum training. This figure was changed thereafter to 40 hours per week. The regular schedule required persons engaged in clinical training at Baptist Hospital to be in the X-ray department Monday through Friday from 7:30 or 8:00 a. m. to 12:30 or 1:00 p. m. In addition, the first-year trainees were on duty two afternoons per week and the second-year trainees three afternoons per week. They also were in training every other Saturday morning, for which time they received compensatory time off during that or a subsequent week. Each person was required to conform to the dress code and rules and regulations applicable to regularly employed X-ray Technologists except for those rules as to clocking in and out on the time clock.

Persons engaged in clinical practicum training at Baptist Hospital also performed "call work" on weekends (other than Saturday mornings) and evenings. Being "on call" in the X-ray department terminology means that persons are actually on duty at the hospital other than on the day shift. Thus, persons engaged in clinical practicum training were assigned to be at Baptist Hospital on evening shifts (3:00 to 11:00 p. m.) during the week and on rotating shifts on weekends and holidays. Commencing sometime in 1973, trainees were no longer assigned to the evening shift on weekdays but continued to be assigned to this shift on weekends and holidays.

Immediately after enrollment in the program, which began each year on July 1, trainees were assigned to participating hos-

---

7. During the period from September 1974 to June 1975, Baptist Hospital had persons assigned to its hospital for clinical training from both the Vanderbilt University Hospital program and the Aquinas Junior College program. The persons from the Vanderbilt University program were those in their second year, being the remainder of the last class admitted in July of 1973. The Aquinas Junior College students were in their first year of training under that program.

pitals. At Baptist Hospital the usual routine was to give each trainee a brief initial orientation, which consisted of a tour of the X-ray department conducted for trainees by a supervisory Radiologic Technologist (hereinafter RT). The X-ray department at Baptist Hospital consists of ten modern, well-equipped rooms devoted to the performance of many types of X-ray procedures. In addition, the X-ray department is charged with responsibility for the performance of X-rays in the emergency room, the operating rooms and in other areas and departments of the hospital. Personnel also perform portable X-rays by the use of X-ray machinery that is capable of being moved to individual patients' rooms throughout the hospital. The vast majority of X-ray procedures performed at Baptist Hospital take place in the ten X-ray rooms located in the department and between the hours of 7:30–8:00 a. m. to about 1:00–1:30 p. m.

As a matter of administrative organization, Dr. Joseph McK. Ivie is Director of the Department of Radiology at Baptist Hospital. In practice, however, the actual functioning of the department insofar as work flow is concerned is the responsibility of supervisory personnel hired for that purpose. Until August 20, 1976, the department at Baptist Hospital was under the control of Dick Hatchell, Chief Technologist. He was assisted, particularly in the area of trainee assignments, by Robert Ayers. At least two additional supervisory technicians were employed. Each of these four persons were RT's. Staff personnel who actually performed the X-ray procedures were also RT's. The RT staff was augmented by other regularly employed persons who performed such functions as moving patients from room to department (patient escorts), serving as receptionist, developing exposed X-ray film, and performing such clerical functions as filing and preparing records of procedures performed.

In theory, when a trainee was assigned to a room or other X-ray area in Baptist Hospital, there would also be assigned an RT employed by the hospital, who, it is asserted by the hospital, would provide training to the trainee. It was the trainee's duty to observe the technologist in the performance of a given procedure with the ultimate goal of being able to perform the procedure himself under the direct supervision of the technologist. The amount of time required for this process varied from trainee to trainee and from procedure to procedure, with the simpler procedures such as chest X-rays being learned very quickly. However, the preponderance of the proof reflects that a number of the rooms were staffed solely by students and that first-year trainees newly assigned to Baptist Hospital were shown how to perform the X-ray procedures by trainees already there, usually those in their second year of the program. Further, those trainees who were assigned to an X-ray room with an RT frequently found themselves working alone or with another trainee because of the constant reassignment of both RT's and trainees to rooms or areas where they were most needed at the moment. Depending on the workload of the department, the trainee or RT would be sent to any other given room to keep the work flowing at a given time. Further, the record is replete with testimony that trainees always staffed the chest X-ray room(s) and frequently did portable X-rays either unassisted or only with other trainees.

Even at the outset of their training, first year trainees were of some value to Baptist Hospital in terms of the actual performance of X-ray procedures in place of RT's. For instance, Cynthia Ayer testified that at the commencement of her first year in the program, the assistant to the Chief RT, Robert Ayers, put her in the chest X-ray room, Supervisory RT Kathy Hopwood showed her how to do two or three chest X-rays, and she was then on her own for the next month doing chest X-rays unassisted.

In addition to performing X-ray procedures alone and with other trainees, all trainees performed a variety of functions which relieved RT's and other employees from such duties. Trainees stocked the X-ray rooms; ran film from the rooms, including emergency room; to the developer;

cleaned up after patient accidents; assisted and/or transported patients from the waiting room to the X-ray rooms; occasionally assisted patients back to their hospital rooms; relieved the waiting room receptionist for lunch, breaks, sickness and other times when she was absent; and performed clerical work more fully described herein.

## 2. Displacement of Regular Employees

In considering whether the trainees assigned to Baptist Hospital displaced RT's and clerical employees, the court finds that within a relatively short period of time the trainees became functioning members of the X-ray department, performing all duties required of them in a fashion that displaced regular employees and under conditions in which the hospital obtained a substantial economic benefit from their services. For example, the chest X-ray is the most common radiographic procedure performed at Baptist Hospital. From January 1, 1970, to January 1, 1971, 38.64% of all procedures at Baptist Hospital were chest X-rays. Tr. Exh. 48.[8] Virtually all chest X-rays performed at Baptist are done by trainees.

Trainees were also assigned to most of the other X-ray rooms in the department. In these rooms they were expected to perform alone or with other trainees. The record indicates, for example, that on at least one occasion, trainee Kathy Alderdice worked the 11:00 p. m. to 7:00 a. m. shift in place of the scheduled RT. Other trainees occasionally were called upon to work a shift to fill in for an RT who failed to report to work. (Tr. Exh. 2 at 48, 49, Tr. 218). Trainees were regularly assigned to do portable X-rays sometimes by themselves and sometimes with other trainees. The performance of such procedures is enhanced when two persons assist each other in performing the procedure in light of the circumstances under which the X-ray must be taken. When working together, on portable procedures as well as all others, the trainees performed a valuable time- and effort-saving function that directly benefited Baptist Hospital.[9]

Trainees also were required to perform administrative, clerical and other secretarial duties in the X-ray department. The requirements of such work extended beyond that of a mere training experience. A substantial amount of time was spent by each trainee in the performance of routine, quickly learned filing and log work and in preparation for the succeeding days' activities. This clerical work became extensive for trainees primarily on weekends, holidays, and other periods outside of the normal daytime shift, because regular employees were not on duty at those times. It is clear that but for the trainees the defendant would have had to hire other employees or require overtime work in order to accomplish the same tasks. (This is emphasized by the fact that Baptist Hospital now pays trainees an hourly wage for the performance of those same duties during non-training time.)

Although defendant's Chief RT Hatchell testified that the hospital was adequately staffed with technologists, he stated in his memorandum of July 10, 1975, to C. David Stringfield, Executive Vice President of Baptist Hospital, that "the point of this is that the areas that require individual technologist number more than the number of technologists we have positions for." Tr. Exh. 43 at 28. Every trainee and RT who expressed an opinion as to whether the number of RT's employed by Baptist Hospital was adequate to perform all X-ray procedures without the help of the trainees responded negatively. As an example, the court noted during trial that Ruth Drexler, former RT at Baptist Hospital, was very

---

8. This was the only year figures for the number of chest X-rays performed at Baptist Hospital were available. Dr. James Steele, a Radiologist and member of the panel of consultants to the AMA Council on Medical Education, testified that nationwide 45 to 60% of all procedures are chest X-rays.

9. Baptist Hospital charged patients the same price for all X-rays regardless of whether made by trainees or RT's.

cautious and very careful about her testimony. She testified in court as follows:

Q. In your opinion, Mrs. Drexler, while you were employed there as a technician, was Baptist Hospital staffed with enough technicians to handle the work load without the students?

A. Without the help of students?

Q. Yes.

A. In my opinion, they would have had to have more help if they had not had students.

Ricky L. Gillard, RT, testified as follows:

A. . . . If they didn't have the students they would have been hiring more technicians.

Q. What do you mean, they didn't have enough technicians?

A. I said if they didn't have any students there, then they would have hired more technicians.

Q. Well, then, what you are saying is that if they had not had the students they would have had to hire more technicians in order to get the work accomplished.

A. Certainly would. In other words, students were used and needed and they were just not there—they were just not there to look, you know, they were used, they were expected to come to work and they were needed.

Tr. Exh. 2 at 46-F.

The Compliance Officer of the Wage and Hour Division who made the investigation of the X-ray department at Baptist Hospital simultaneously investigated the X-ray department at Vanderbilt University Hospital since both hospitals were involved with the same radiologic technology program. He testified that Vanderbilt employed approximately the same number of RT's (approximately 16) and had approximately the same number of trainees (approximately 10) during the time relevant to this lawsuit as Baptist Hospital; that Vanderbilt Hospital withdrew from the program as of July, 1974, and all the trainees left its X-ray department at that time; and that the very next week Vanderbilt hired five additional RT's and one more the following week to replace the trainees. The court questioned Dr. Richard Cannon, Dean of the Division of Allied Health Professions, Vanderbilt University Medical School, about whether trainees had displaced RT's at Vanderbilt, and he reluctantly admitted they had (Tr. 522). This fact is corroborative of the more direct proof that trainees at Baptist Hospital displaced regular employees.

3. Educational Validity of the Program

The Secretary contends and the court agrees that the training received by the trainees at Baptist Hospital was deficient in the following ways: (1) The training was not closely supervised by RT's. (2) The hospital did not require the trainees to keep their ASRT Records of Clinical Experience, as required by the RT training program. Such records as were kept were shams; for instance, RT's who signed trainees off as being qualified to do certain procedures had not actually observed the trainees performing the procedures. (3) Trainees were not rotated through the operating and emergency rooms, and many were not rotated through special procedure rooms. Some were not rotated at all but were restricted to performing just one or a few procedures. (4) Trainees were not given adequate orientation when they were assigned to the hospital. (5) A substantial portion of the trainee's time was spent in routine activities that would be at best only of peripheral value to an education in X-ray technology.

The policy of the Joint Review Committee on Radiologic Technology on trainee supervision is that the first 50% of clinical training shall be under direct supervision. This is defined as supervision by a registered technologist or radiologist present while the X-ray examination is being performed (Tr. Exh. 82 at 13 and Exh. 83 at 12). Dr. James Steele described a training situation as one where the procedure is actually retarded or impeded, "because if you are doing your job properly, you have to explain and teach the student while you are doing it, show him what you are doing, why you are doing it and how you do it and watch to see that he does it and check what

he's doing to make sure that he's doing it properly." [10]

It is true that a trainee may be gaining knowledge while he or she is performing X-ray procedures alone and unassisted or when performing one function, such as setting or adjusting the X-ray machine, while another person performs another function, such as positioning the patient or running the film to the processor. The preponderance of proof reflects that when a trainee performs with another person in this manner the time required for the procedure is shortened.[11] However, this is not a bona fide training situation as contemplated by the RT program nor even by Dr. Steele's own definition of such. The proof further shows that a very substantial amount, if not most, of the training of the first year trainees is done by the second year trainees. Certainly, such a training situation (one student training another) was not under the direct supervision of an RT as required by the program (Tr. Exhs. 82 and 83), nor did it qualify as being close supervision by the employer unless an employer-employee relationship existed between the hospital and the trainee doing the training.

Few, if any, of the trainees were rotated through the emergency room, which was supposedly the primary purpose of their working "call" duty in the evenings and on weekends, unless it could be said that it was for the purpose of doing the routine clerical work described herein. Both Dr. Steele and Robert Coyle, RT and Executive Director of the Joint Review Committee on Radiologic Technology, testified that all trainees should be rotated through the emergency rooms. They further testified that the program contemplated trainee rotation through the operating rooms and special procedures rooms as well as all others.[12] Few, if any, of the trainees were rotated through the operating rooms and many were not exposed to special procedures. Former trainee Frank Robertson testified that he worked in the emergency room for two days on one occasion as a relief for technologist Larry Drake, who was out due to sickness or some other reason. However, he was never rotated or assigned to the emergency room for training. Further, the proof reflects that rotation of the trainees to the various X-ray rooms for exposure to and training in the performance of the many different X-ray procedures was sporadic. For instance, Nelson Peavahouse testified that he spent most of his 15-month training period at Baptist in the special procedures rooms and that he was assigned to do nothing but portable X-rays for the last four or five months of his training. Some of the trainees rarely got out of the chest X-ray room.

When working "call" shifts (evenings and weekends as discussed above) an inordinate

---

**10.** This appears to be inconsistent with Dr. Steele's testimony defining the term "direct supervision" to include situations where the RT is somewhere other than in the room with the trainee who is performing the X-ray procedure.

**11.** In this connection, Dr. Steele testified as follows:

Q. Overall, how many technologists does it take to man one X-ray room?
A. Well, gee, that's kind of a hard question to answer, because it depends on what kind of an X-ray room you are talking about, but if you want to shoot for a figure, I would say two. But one can do in certain cases a great deal.
Q. Well, would you need one person, more than one person to man a normal fluoro room?
A. You wouldn't need more than one, although it's highly desirable from the physician's point of view to have more than one.

It speeds up his work, but you don't need more than one.

Further, Ruth Drexler, RT, testified that when an RT was assisted by a trainee it speeded up or shortened the time required to perform the procedure.

**12.** Dr. Steele explained that "The underlying philosophy behind the whole combination of both didactic and clinical training, and particularly clinical training, is to prepare students so that at the end of his educational period he is prepared to go into the job market qualified to accept and perform the duties expected of him as a radiologic technologist in any situation . . . . We have no way of knowing where the particular individual is going to wind up when he graduates from the program, and we feel a moral, to say nothing of a legal responsibility to prepare him so that his job opportunities will not be limited by deficiencies in his educational experience."

amount of trainees' time was consumed in the performance of routine, easily and quickly learned clerical work consisting of checking closed alphabetized files to determine if patients had been previously X-rayed at Baptist Hospital, typing up index cards and filing patients' folders after the X-ray procedures were completed. Time spent in such work by the trainees ranged up to 95% of their "call" time. It was, at most, of peripheral value to a person's training in X-ray technology. Robert Coyle testified that the guidelines for the RT Program did "not prohibit the assignment of students to other than normal working hours [13] of the department for specific educational experiences, as long as such experiences are planned and in conformance with Joint Review Committee policy on the supervision of students." Baptist Hospital did not adhere to this condition in that when on "call" the trainees did not get planned specific educational experiences. They did nothing that they had not done during normal hours except perhaps more clerical work. Further, the trainees were required to perform a variety of other duties consuming a considerable amount of time which were of questionable educational value. Certainly the protracted performance of such tasks as transporting patients to and from various rooms, running film between departments, cleaning up after patient accidents, relieving the receptionist, and answering the telephone appears to have little, if any, relationship to sound educational objectives of a radiologic technology program.

Coyle testified that the Joint Review Committee requires that the second-year students' training be devoted to individualized instruction, correcting deficiency, and improving skill and proficiency. Such did not occur at Baptist Hospital. Second-year trainees simply continued to be assigned to work wherever they were needed without regard to their becoming proficient in all areas of the various X-ray procedures. He further testified that first-year students should not be allowed to perform X-ray procedures unattended nor to take portable X-rays throughout the hospital unattended. Dianne George, Educational Director of the program, testified that, "A beginning student would never be assigned alone to any X-ray room. I'm virtually positive of that." Tr. Exh. 63 at 116. Yet the record is replete with testimony that first-year students immediately upon and throughout their assignment to Baptist Hospital regularly and routinely did perform X-ray procedures alone and unattended. RT's were never told by anyone that they were supposed to train the trainees, and the trainees were of the opinion that they were simply in a work situation at Baptist rather than being in training. (This was established by in-court testimony and is also evidenced in Exh. 2 at 18, 19, 30, 31, 44, 45, 47, and 60.) An example is the case of trainee Ricky Gillard who had four years of training as an X-ray technologist in the United States Air Force prior to enrolling in the Vanderbilt University Hospital program. He was simply used and treated as an unpaid X-ray technologist during those periods of time he was assigned to Baptist Hospital as a trainee. Tr. Exh. 2.

### 4. Primary Benefit

It is beyond question that the defendant received direct and substantial benefit from the work performed by trainees, work that would otherwise have been done by regular employees and work for which the hospital charged patients at full rates.[14] Had the training program been found to be educationally sound the court might nevertheless have concluded that the bulk of the benefit inured to the trainees, but because the trainees were shortchanged educationally the court finds that the hospital was the primary benefactor from the relationship

---

**13.** Normal hours are described as the eight-hour period during which the Department of Radiology is fully staffed to provide complete radiologic services.

**14.** *See* note 9 *supra.* The court does not mean to suggest that this practice was in itself improper. It did, however, serve to augment the benefit derived by the defendant from its relationship with the trainees.

between it and the trainees. Simply stated, the hospital exploited the training program, turning it to its own advantage. That its advantage might in turn be to the advantage of the public does not justify violating the interests served by the FLSA, which are also designed to promote the public good.

■. In view of the circumstances of the whole activity as set out in the foregoing findings, the court concludes that the activities of the trainees while on duty at Baptist Hospital transcended those of a bona fide training situation and became those of employees. The economic reality is that the trainees functioned as an integral part of the operation of the Radiology Department without pay. Because, as discussed *infra,* the hospital is not entitled to the defense of "good faith," the trainees are entitled to compensation for their hours of work at the hospital in compliance with the monetary provisions of the Act.

### III. GOOD FAITH DEFENSE—RELIANCE AND CONFORMITY

Section 10 of the Portal to Portal Act of 1947, 29 U.S.C. § 259, provides in pertinent part as follows:

(a) . . . *[N]o employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act* of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis [*sic*] Act, *if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written* administrative regulation, order, ruling, approval, or *interpretation,* of the agency of the United States specified in subsection (b) of this section, *or any administrative practice or enforce-*

*ment policy of such agency* with respect to the class of employers to which he belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect.

(b) The agency referred to in subsection (a) of this section shall be—

(1) in the case of the Fair Labor Standards Act of 1938, as amended—the Administrator of the Wage and Hour Division of the Department of Labor; . . .

(Emphasis added.) This is "the exclusive estoppel defense to actions under the Fair Labor Standards Act." *Usery v. Godwin Hardware, Inc.,* 426 F.Supp. 1243, 1268 (W.D.Mich.1976). Where the defense is established it acts to deprive the court of any further jurisdiction, as is evidenced both by the language of section 259 itself, stating that the defense shall be a "bar," and by the declared policy of the Portal to Portal Act "to define and limit the jurisdiction of the courts." 29 U.S.C. § 251(b)(3).

Defendant asserts that it relied on interpretations and an enforcement policy first issued by the administrator on a case by case basis in public domain opinion letters [15] and then generally formulated as follows in sections 10b11 and 10b14(a) of the Wage and Hour Division's Field Operations Handbook:

10b11 *Trainees and student trainees.* (a) The Supreme Court has held that the words "to suffer or permit to work" as used in the FLSA to define "employ" do not make all persons employees who,

---

**15.** One such opinion letter dealing specifically with a training program for X-ray technicians is addressed to a hospital administrator in El Paso, Texas, and dated July 19, 1967. This letter consists primarily of language virtually identical to sections 10b11 and 10b14(a) of the Wage and Hour Division's Field Operations Handbook, which are quoted in text *infra.* However, after listing the six "factors" attrib-

uted to the Supreme Court as indicators of a valid training program, the Wage and Hour administrator stated that "The materials you provided indicates [*sic*] that the essentials of the above criteria are present in your training program." This sentence is then followed by the enforcement policy subsequently published in the handbook as 10b14(a). *See* Tr. Exh. 18. *See also* Tr. Exhs. 22, 23, 26, 28, 29, and 31.

without any express or implied compensation agreement, may work for their own advantage on the premises of another. (b) Whether trainees or students are employees of an employer under the FLSA will depend upon all of the circumstances surrounding their activities on the premises of the employer. If all six of the following criteria apply, the trainees or students are not employees within the meaning of the FLSA;

(1) the training, even though it includes actual operation of the facilities of the employer, is similar to that which would be given in a vocational school;

(2) the training is for the benefit of the trainees or students;

(3) the trainees or students do not displace regular employees, but work under their close supervision;

(4) the employer that provides the training derives no immediate advantage from the activities of the trainees or students, and on occasion his operations may actually be impeded;

(5) the trainees or students are not necessarily entitled to a job at the conclusion of the training period; and,

(6) the employer and the trainees or students understand that the trainees or students are not entitled to wages for the time spent in training.

10b14 *Students training in paramedical occupations—nurses, X-ray technicians, etc.* (a) Whether a student training for certain paramedical occupations is viewed as an employee of a hospital within the meaning of the Act will depend upon all the circumstances of the student's activities on the premises of the establishment. *Pending interpretation by the courts, Wage-Hour will not assert that a student in training to become a* registered nurse, licensed vocational or practical nurse, *X-ray technician,* certified laboratory assistant or for any other paramedical position *where on-the-job training is combined with classroom lectures and laboratory instruction to comprise an extensive program of education generally leading to a degree or to licensing,* registration or certification by an appropriate board or society *is an employee of the hospital* where so engaged. The mere payment of a scholarship, stipend or allowance (as long as it does not exceed a reasonable approximation of the expenses incurred by the trainee taking the course or where it serves as an allowance for subsistence) will not be considered to establish an employment relationship.

(Emphasis added.)

Defendant understandably stresses its conformity with and reliance on the enforcement policy expressed in the middle sentence of 10b14(a). Although, as discussed more fully herein, the court does not agree with all the arguments advanced by plaintiff on this issue, it does agree, for two reasons, that defendant has not established the defense.

### A. Court's Reasoning
#### 1. Good Faith Reliance

Good faith under 29 U.S.C. § 259 requires that an employer react to an administrative pronouncement as a reasonably prudent person would react under similar circumstances. *Kam Koon Wan v. E. E. Black, Ltd.,* 188 F.2d 558, 562 (9th Cir.), *cert. denied,* 342 U.S. 826, 72 S.Ct. 49, 96 L.Ed. 625 (1951). Thus, any factors that would put an employer on notice that the ruling was not authoritative, or was qualified or incomplete would put the employer on notice that his reliance was not made in good faith. *Burke v. Mesta Machine Co.,* 79 F.Supp. 588, 611 (W.D.Pa.1948).

The opinion letters and the Field Operations Handbook are replete with language that conveys to the reasonable reader the fact that the circumstances of any particular training program might be such as to create an employment relationship. The sentence emphasized by defendant is concededly the least qualified, most authoritative pronouncement. However, it cannot reasonably be read out of context, and more importantly, it is internally qualified by the phrase, "Pending interpretation by the courts." Thus while Wage and Hour might

be estopped by this enforcement policy from asserting unilaterally in an administrative proceeding that such trainees were hospital employees, it is not estopped from seeking a judicial determination on the facts of a particular training program as it has done in this case. To hold otherwise would be to say that Wage and Hour could abdicate its responsibility to enforce violations of the FLSA, no matter how blatant.

### 2. Good Faith Conformity

Even if the enforcement policy could have been relied on in good faith, the circumstances of the program itself, as set forth in Part II of this memorandum opinion cannot be said to constitute good faith compliance with the administrator's pronouncements concerning training programs. Technical conformity [16] with the criteria listed in the 10b14 enforcement policy is not the equivalent of good faith conformity, and where a hospital abuses a training program to the extent evident in this case, the element of good faith required by 29 U.S.C. § 259 is lacking.

■■ In sum, the defense provided by the Portal to Portal Act is not available to employers who merely rely and conform. Both must be done *in good faith.* Congress put those words in the statute and this court cannot and will not read them out.

### B. Plaintiff's Theories

The court now finds it both helpful and necessary to discuss some of plaintiff's arguments on this matter in order to stress that the court's holding does not sanction these views.

■ Plaintiff cites *Brennan v. Ace Hardware Corp.,* 495 F.2d 368 (8th Cir. 1974), for the proposition that as a matter of law the Field Operations Handbook does not have the force and effect of regulations that are binding on the Secretary. This court, with-

out so holding, has no reason to doubt the validity of this principle. *See United States v. Shulman,* 466 F.Supp. 293 (S.D.N.Y.1979), *portions reprinted in* 24 Crim.L.Rep. 2523 (Mar. 23, 1979). *See also United States v. Caceres,* —— U.S. ——, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979). Plaintiff argues, however, that because, as noted in *Brennan, supra,* at 376, the handbook was "not published in the Federal Register, [was] not intended by any government officials to have the force and effect of law, and [was] only [a *guideline*] for government personnel," the handbook therefore could not be relied on in good faith. In the recent *Shulman* case, *supra,* the court made similar findings as to the U. S. Attorney's Manual and held that it conferred no substantive rights on criminal defendants. In the instant case, however, the right to rely on the Wage and Hour Field Operations Handbook is conferred by 29 U.S.C. § 259, *supra.* The statute contains no limitation on the pronouncements of the Administrator that can be relied on, except that regulations, orders, rulings, approvals, and interpretations must be "written." Pronouncements of the Administrator in the form of administrative practices or enforcement policies do not even bear this limitation. Thus it is the opinion of this court, albeit dictum, that the Field Operations Handbook may be relied on for purposes of establishing a defense pursuant to 29 U.S.C. § 259.

■ Plaintiff also contends that defendant held its belief that its X-ray trainees were not employees *before* it learned of the Administrator's interpretations and enforcement policy allegedly relied on and that under the holding of *Spring v. Washington Glass Co.,* 153 F.Supp. 312 (W.D.Pa. 1948), defendant may not claim reliance on administrative pronouncements that merely buttress its pre-existing opinion. This court believes that it would be patently absurd to

---

**16.** Whether defendant in this case had even achieved technical conformity with the middle sentence of 10b14(a) is open to argument. It could perhaps be said that the program conducted in Baptist Hospital's Department of Radiology was not a training program at all, rather than that it was a training program abused beyond the bounds of good faith. This may be merely a matter of semantics, but in the law matters of semantics are often of considerable consequence.

hold as a general rule that defendants whose pre-existing views happen to comport with administrative pronouncements could never be said to act thereafter in reliance on them. *Spring* was decided on its particular facts indicating that the claimed reliance was a ruse, that there was no reliance at all, much less reliance in good faith. The defendant in *Spring* received a letter from a Wage and Hour investigative supervisor containing findings both favorable and unfavorable to defendant's position. "[D]efendant did not accept the [unfavorable] finding; but, of course, it agreed with the favorable finding which coincided with its pre-existing views." *Id.* at 318. The court also held that the investigative supervisor was not an authority whose pronouncements could be relied on under the statute. *Id.*

Another argument advanced by plaintiff in the instant case is that because lesser officials of the Department of Labor than the Wage and Hour Administrator cannot be relied on under section 259, "hearsay" repetitions of persons not even associated with the Department cannot be relied on in good faith. Plaintiff then points to the fact that defendant had no direct communication from the Department of Labor. The protection afforded employers by section 259 does not depend on direct communication to that employer, as the language of the statute makes plain. (The court would note, however, that where as here the Administrator's pronouncements themselves make it clear that the determination of an employment relationship in a certain type of situation depends on all the circumstances of each case, good faith reliance on less than direct communication becomes more difficult to establish.)

Lastly, plaintiff contends that the enforcement policy presented in the last *two* sentences of section 10b14(a) of the Field Operations Handbook, quoted *supra,* were intended to refer only to cases where payment of a stipend to trainees was the sole factor suggesting an employment relationship. Although the testimony of James L. Suntum, Chief of the Branch of Coverage and Exemptions of the Wage and Hour

Division, as to the historical background and development of the policy lends credence to this argument, *see* Tr. Exh. 33, vol. I at 32–33, the policy as formulated does not convey the meaning allegedly intended. Good faith reliance under 29 U.S.C. § 259 does not require employers to exercise clairvoyance.

## IV.  WILLFULNESS

While good faith is a major element of the defense to liability under section 10 of the Portal to Portal Act, 29 U.S.C. § 259, it is irrelevant to the issue of "willfulness" that is the key to the extent of liability. Section 6 of the Portal to Portal Act, 29 U.S.C. § 255, provides in pertinent part as follows:

> Any action commenced on or after May 14, 1947, to enforce any cause of action for unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis [*sic*] Act—
>
> (a) if the cause of action accrues on or after May 14, 1947—may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, *except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued* ; . . . .

As stated in *Conklin v. Joseph C. Hofgesang Sand Co.,* 407 F.Supp. 1090 (W.D.Ky. 1975), *aff'd,* 565 F.2d 405 (6th Cir. 1977),

> [A]n employer acts willfully and subjects himself to the three year liability provision if he knows or has reason to know that his conduct is governed by the Act. Neither a good faith belief in the lawfulness of his wage and overtime regulations nor ignorance of their invalidity shields the employer from the additional year of liability.

*Id.* at 1094.  In *Coleman v. Jiffy June Farms, Inc.,* 458 F.2d 1139, 1142 (5th Cir.

1972), the court said, "Stated most simply, we think the test should .be: Did the employer know the FLSA was in the picture?" *See also Pezzillo v. General Telephone & Electronics Information Systems, Inc.,* 414 F.Supp. 1257 (M.D.Tenn.1976) (willful means intentional, knowing, or voluntary *as distinguished from accidental* ) (emphasis in original), *aff'd,* 572 F.2d 1189 (6th Cir. 1978).

■ There is no doubt that Baptist Hospital's violations of the FLSA in this case were willful under even the most restrictive of the above definitions. It is clear from the evidence set forth in the findings of fact that defendant has been aware since the passage of the Fair Labor Standards Act Amendments in 1968 that it was subject to the Act's provisions. Nevertheless, it has engaged in the course of conduct set forth in these findings. The defendant never sought advice from the Department of Labor and as a matter of fact attempted to conceal the facts surrounding its relationship with the trainees by refusing the Compliance Officer access to its records and other information that he was entitled to inspect under section 11(a) of the Act, 29 U.S.C. § 211(a). This court therefore holds that defendant is liable for unpaid wages and unpaid overtime compensation, if any, which accrued and became due to persons assigned to the hospital for training in radiologic technology during the period from October 21, 1972, to the present.

As at both law and equity, interest is allowed on back wages due under the Act. Therefore, payment of such back wages shall be with interest at the rate of ˜six percent (6%) per annum from the dates such amounts became due until the date of payment. *Miller v. Robertson,* 266 U.S. 243, 45 S.Ct. 73, 69 L.Ed. 265 (1924); *Hodgson v. American Can Co.—Dixie Products,* 440 F.2d 916 (8th Cir. 1971); *Shultz v. Wheaton Glass Co.,* 391 F.Supp. 229 (D.N.J.1970), *aff'd,* 446 F.2d 527 (3rd Cir. 1971); *Hodgson v. Daisy Manufacturing Co.,* 445 F.2d 823 (8th Cir. 1971).

Defendant shall compute and pay the back wages due, subject to verification by representatives of the plaintiff.

## V.   INJUNCTIVE RELIEF

■ The question of whether an injunction should be granted is addressed to the sound discretion of the trial court. *Wirtz v. Lunsford,* 404 F.2d 693 (6th Cir. 1968); *Wirtz v. Flame Coal Co.,* 321 F.2d 558 (6th Cir. 1963). The purpose of an injunction is not to punish an employer, but rather to protect the public interest in insuring against substandard wages. In *Flame Coal,* the Court of Appeals for the Sixth Circuit acknowledged that "[t]he issuance of an injunction under the Fair Labor Standards Act is addressed to the reasonable discretion of the trial judge," but pointed out that "[t]he denial of injunctive relief may, however, transcend the limits of 'reasonable discretion.' Where there has been a clear violation of the statutes and regulations, . . . . there should be assurance that the offending party will in the future voluntarily comply with the Act. Otherwise, injunction should be issued, and the trial judge's refusal to do so may constitute abuse of discretion." *Wirtz v. Flame Coal, supra,* at 560. There have been no such assurances in this case, and plaintiff is entitled to the injunctive relief prayed for in the complaint.

Judgment shall be entered for the plaintiff with costs to be taxed against the defendant.