Ray MARSHALL, Secretary of Labor, United States Department of Labor, Plaintiff-Appellee,

v.

BAPTIST HOSPITAL, INC., d/b/a Baptist Hospital, Defendant-Appellant.

No. 79–1398.

United States Court of Appeals, Sixth Circuit.

Argued March 31, 1981.

Decided Dec. 17, 1981.

John R. Trapnell, Robert J. Martin, Jr., Elarbee, Clark & Paul, Robert Buckler, Atlanta, Ga., Thomas W. Schlater, Nashville, Tenn., for defendant-appellant.

Joe B. Brown, U. S. Atty., Nashville, Tenn., Don Shire, Asst. Sol., Fair Labor Standards, Kerry Adams, Washington, D. C., Ralph York and Robert Haynes, U. S. Dept. of Labor, Nashville, Tenn., for plaintiff-appellee. .

Before MERRITT, KENNEDY and MARTIN, Circuit Judges.

MERRITT, Circuit Judge.

The main issue here is whether defendant hospital can successfully invoke the good faith defense provided by the Portal to Portal Act so as to exempt their clinical program from the minimum wage and hour provisions of the Fair Labor Standards Act. The District Court, in a comprehensive opinion published at 473 F.Supp. 465 (M.D. Tenn.1979), annotated at 50 A.L.R.Fed. 607 (1980), found the hospital liable for $170,000 in minimum wage payments to X-ray students enrolled in a two-year college program of classroom study and hospital clinical training leading to a degree. The District Court also, by injunctive order, required in effect that the hospital pay students the minimum wage in the future so long as it continues to operate the program in its present form. The hospital claims under provisions of the Portal to Portal Act that the promulgation of regulations respecting X-ray students estop plaintiff from asserting coverage. We agree and, therefore, reverse.

An "employee" covered by the FLSA is defined elliptically as "any individual employed by an employer." 29 U.S.C. § 203(e)(1) (1976). The District Court, using an "economic realities" test of employment, held that the clinical training portion of the program is not a bona fide educational program because students are not adequately supervised and quickly become regular working members of the hospital's X-ray department, thereby displacing regular employees under circumstances in which the hospital receives more benefit from the arrangement than the students. Under requirements promulgated by the American Medical Association, completion of the clinical course enables students to take a test and become certified as X-ray technicians.

For many years Vanderbilt University Hospital conducted a two-year program for training X-ray technologists. On entry into the program, students were assigned to one of the participating hospitals, including Baptist, for clinical practicum training. Academic classes were held approximately nine hours per week in the first year of training and six hours per week the second year. In 1973 the accreditation agency of the American Medical Association recommended that the Vanderbilt radiologic technologist program not be approved due to lack of guidance between Vanderbilt and the participating hospitals and other problems. Aquinas Junior College began to sponsor and administer the program in 1974. It offered academic classes and placed students into participating hospitals. Graduates of the Aquinas program received an associate's degree and became eligible to be tested for certification as a Radiologic Technologist (RT).

Aquinas students training at Baptist spent approximately five hours per morning, Monday through Friday, at the Baptist X-ray department. First-year trainees spent two afternoons per week in the hospital and second year students spent three. Students worked every other Saturday morning and were given compensatory time

for those weekend hours. Students were required to conform to all the rules and regulations of the X-ray department, except for punching the time clock. Students were also assigned to evening shifts on weekends and holidays ("call" time).

When a new trainee arrived at Baptist, the hospital would give a "brief initial orientation" consisting of a tour of the X-ray department. Rather than assigning trainees to one of the ten X-ray rooms for supervision by an RT, the District Court found that

the preponderance of the proof reflects that a number of the rooms were staffed solely by students and that first-year trainees newly assigned to Baptist Hospital were shown how to perform the X-ray procedures by trainees already there, usually those in their second year of the program. Further, those trainees who were assigned to an X-ray room with an RT frequently found themselves working alone or with another trainee because of the constant reassignment of both RT's and trainees to rooms or areas where they were most needed at the moment.... Further, the record is replete with testimony that trainees always staffed the chest X-ray room(s) and frequently did portable X-rays either unassisted or only with other trainees.

473 F.Supp. at 472.

The court also found that trainees performed a variety of functions that relieved RTs and other employees of such duties.

In evaluating the functions of the trainees, the District Court found that "within a relatively short period of time the trainees became functioning members of the X-ray Department, performing all duties required of them in a fashion that displaced regular employees and under conditions in which the hospital obtained a substantial economic benefit from their services." *Id.* at 473. But for the trainees, concluded the court, Baptist would have had to hire other employees or require overtime work. The court noted that when Vanderbilt phased

out its training program and discontinued all use of trainees, it was required to hire six additional RTs. *Id.* at 474.

The District Court next concluded that the training of the students at Baptist was deficient because of the lack of close supervision, absence of records, absence of a complete rotation system, inadequate orientation, and performance of functions of only peripheral value to the program. Finally the court concluded that the hospital was the primary beneficiary of the relationship. "It is beyond question that the defendant received direct and substantial benefit from the work performed by trainees, work that would otherwise have been done by regular employees and work for which the hospital charged patients at full rates." When viewing the benefit derived by the hospital in light of the fact that the "trainees were short-changed educationally" the court concluded that the primary beneficiary of the relationship was Baptist.

Although the hospital forcibly attacks the District Court's findings of fact and conclusions, we do not believe that the District Court applied an erroneous test of liability under the FLSA, and we agree that the record supports the general findings of the court below that the clinical training program was seriously deficient in supervision, and that the students continued to perform clerical chores long after the educational value of that work was over.

The problem with the District Court's decision is that it fails to interpret correctly the estoppel provisions of the Portal to Portal Act, 29 U.S.C. § 259 (1976), and the published rules and guidelines of the Department of Labor governing minimum wage liability of hospitals to students training for X-ray work.

The Portal to Portal Act provides that the Wage and Hour Division of the Department of Labor may not subject an employer to minimum wage liability if the employer shows "that the act ... complained of was in good faith in conformity with and in reliance on any written administrative reg-

ulation, order . . . or interpretation of the agency . . . ."[1]

The administrator had issued an interpretation specifically governing paramedical students, and more specifically, governing X-ray students. The ruling is entitled "Students Training in Paramedical Occupations—Nurses, X-ray Technicians, Etc." Section 10b14, *Department of Labor, Wage-Hour Field Operations Handbook.* The first sentence of the ruling provides: "Whether a student training for certain paramedical occupations is viewed as an employee of a hospital . . . will depend on all the circumstances of a student's activities on the premises of the establishment." The second sentence governing X-ray students and certain other specified medical students provides: "Pending interpretation by the courts, Wage-Hour will not assert that a student in training to become a registered nurse, licensed vocational or practical nurse, X-ray technician, certified laboratory assistant or for any other paramedical position where on-the-job training is combined with classroom lectures and laboratory instruction to comprise an extensive program of education generally leading to a degree or to licensing, registration or certification by an appropriate board or society is an employee of the hospital where so engaged." This second sentence specifically governing X-ray students is not qualified

by "circumstances" or by reference to any independent set of factors or other standard respecting displacement of regular employees or quality of training. No judicial interpretation of the Act respecting paramedical training programs existed prior to this case.

It is not disputed that the hospital's personnel director received and read this ruling. He testified that he had considered the ruling and believed that it meant that the Wage and Hour Division would not attempt to make his hospital pay minimum wages to its clinical X-ray students so long as they were "in training to become . . . X-ray technicians . . . where on-the-job training is combined with classroom lectures and laboratory instruction to comprise an extensive program of education generally leading to a degree or to licensing . . . by an appropriate board." The students here fit precisely within the terms of this rule.[2]

The Congressional purposes behind the Portal to Portal Act are stated in its first section. Congress found in 1947 that the federal courts were interpreting the minimum wage law "in disregard of long established customs, practices, and contracts between employers and employees, thereby creating wholly unexpected liabilities, immense in amount and retroactive in operation;" that such interpretations "created . . . continuous uncertainty on the part of

1. The complete language of the section is as follows:

(a) In any action or proceeding based on any act or omission on or after May 14, 1947, no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938, as amended [29 U.S.C. 201 et seq.], the Walsh-Healey Act [41 U.S.C. 35 et seq.], or the Bacon-Davis Act [40 U.S.C. 276a et seq.], if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the agency of the United States specified in subsection (b) of this section, or any administrative practice or enforcement policy of such agency with respect to the class of employers to which he belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such

act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect. 29 U.S.C. § 259(a) (1976).

2. An employer who acts in reliance on an administrative ruling will have acted "in good faith so long as the ruling remained unrevoked and the employer had no notice of any facts or circumstances which would lead a reasonably prudent man to make further inquiry as to whether the employees came within the act's provisions." 29 C.F.R. § 790.15 (1980), Defense of Good Faith Reliance on Administrative Regulations, etc., 29 C.F.R. §§ 790.13 *et seq.* (1980), explicating sections 9 and 10 of the Portal to Portal Act. See *Hodgson v. Square D Company*, 459 F.2d 805 (6th Cir. 1972) (apply C.F.R. interpretations to estoppel defense).

... both employer and employee;" and that employees were receiving "windfall payments including liquidated damages, of sums for activities performed by them without any expectation of reward beyond that included in the agreed rates of pay;" and that individuals could potentially receive payment "for engaging in activities no compensation for which had been contemplated by either the employer or employee at the time they were engaged ...." 29 U.S.C. § 251(a).

The language and legislative history of this Act indicate that courts should be hesitant to impose retroactive minimum wage liability on employers in the face of an administrative interpretation which the employer could plausibly interpret as insulating him from liability. See H.R. No. 71, 80th Cong., 1st Sess. [1947] U.S.Code Cong. & Ad.News 1029, 1936. The statement of Congressional purpose indicates that we should not necessarily lean in favor of coverage when construing administrative regulations under § 259 of the Act. Rather, the statement of purpose indicates that in close cases we should consider the expectations of the contracting parties and the reasonableness of the employer's actions in light of the administrative interpretation in question.

Here the administrative interpretation is ambiguous. One sentence, the first, suggests that the administrative agency retains discretion to judge medical training programs on a case by case basis. The next sentence then provides a specific rule that eliminates agency discretion in cases involving nurses and X-ray technicians. The two sentences would be inconsistent unless the second sentence is read as an exception to the first. The first establishes a seemingly elastic, discretionary, "fair-under-the-circumstances" standard. The second establishes a flat rule. The Labor Department argues, and the District Court held, that we should give the language of the first sentence content by referring to another administrative interpretation which sets out several factors to be considered generally in determining whether "trainees or students are employees": (1) expectation of parties respecting wages; (2) whether the student is entitled to a job with the employer at the end of the training; and (3) whether the training program is primarily for the benefit of the student or the employer, a determination in which the key factors are the nature of the supervision the employer gives the student and whether regular workers are displaced. Section 10b11, *Wage-Hour Field Operation Handbook*. If, however, a general discretionary standard using these factors is to be employed for X-ray students and nurses, it is difficult to understand why the Wage and Hour Division wrote a separate, specific, rule-type provision for them leaving out any reference to supervision and displacement. It appears to us that hospitals would be justified in thinking that this separate rule was written for them in recognition of the fact that X-ray students, student nurses and medical interns may often work without direct supervision and may at times displace other workers at the hospital.

In view of this ambiguity, we believe a hospital employer does not act irrationally or in bad faith, as the District Court held, when the hospital chooses to believe that the specific rule rather than the indefinite standard governs its treatment of X-ray students. Therefore, under the Portal to Portal Act, the hospital's reliance on the rule contained in the second sentence of the administrative interpretation insulated it from retroactive liability for minimum wages otherwise due X-ray students.

The remaining question is what to do about the injunctive order and the requirement that the hospital pay the minimum wage in the future so long as the program is operated in its present form. Section 259 of the Portal to Portal Act says that "no employer shall be subject to any liability or punishment" under the FLSA when he is found to have relied on an administrative interpretation and further that "such a defense, if established, shall be a bar to the action ... notwithstanding that ... such administrative ... interpretation ... is modified or rescinded ...." We conclude that this language also bars the injunctive order. When the broad purposes of the Act

contained in section 1, quoted above, are read with the language barring "any liability" even where the interpretation is later modified, one must conclude that the defense is jurisdictional in nature and includes equitable as well as legal liability arising from past conduct. The District Court was correct in its observation that "[w]here the defense is established it acts to deprive the court of any further jurisdiction, as is evidenced both by the language of section 259 itself, stating that the defense shall be a bar, and by the declared policy of the Portal to Portal Act to define and limit the jurisdiction of the courts. 29 U.S.C. § 251(b)(3)." 473 F.Supp. at 477.

Accordingly, the judgment of the District Court is reversed.